Garrett K. Sakimae (SBN 288453)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099
sakimae@fr.com

R. David Hosp (Pro Hac Vice)
Sheryl Garko (Pro Hac Vice)
Mark S. Puzella (Pro Hac Vice)
Laura B. Najemy (Pro Hac Vice)
1 Marina Park Dr.
Boston, MA 02210
Telephone: (617) 542-5070
Facsimile: (617) 542-8906
E-mail: hosp@fr.com; garko@fr.com
        puzella@fr.com; najemy@fr.com

*[Additional counsel listed on last page]*
*Attorneys for Defendant*
NEW BALANCE ATHLETICS, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEILA DASHNAW, WILLIAM MEIER, and SHERRYL JONES, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NEW BALANCE ATHLETICS, INC., a corporation; and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. 3:17-cv-00159-L-JLB <br><br> **NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS** <br><br> Judge: Hon. M. James Lorenz <br> Courtroom:  5B <br><br> Special Briefing Schedule Ordered |

17cv00159

## <u>TABLE OF CONTENTS</u>

I.   **INTRODUCTION** ...................................................................................1

II.  **STATEMENT OF FACTS** ...................................................................... 2

A.  New Balance's Commitment to U.S. Manufacturing  ......................................2

B.  New Balance's Truthful, Qualified Marketing ..............................................4

C.  Most Class Members Were Not Influenced By "Made In The USA" Claims ...................................................................................5

D.  Most Class Members' "Made In The USA" Expectations Are Met By 70% Domestic Value.................................................................... 6

E.  Named Class Members ............................................................................7

III. **OPPOSITION TO CLASS CERTIFICATION** ..........................................8

A.  Plaintiffs and Absent Class Members Lack Standing For Claims  .................9

   1.  Absent Class Members May Lack Standing.................................... 9

   2.  Plaintiffs Lack Standing To Seek Injunctive Relief .................... 11

B.  The Class Is Not Ascertainable  ...........................................................13

   1.  Identification Of Class Members Is Unfeasible........................... 13

   2.  The Class Definition Is Overbroad And Imprecise .................... 16

C.  Plaintiffs Fail To Meet The Strict Requirements Of Rule 23 ......................17

   1.  Common Issues Do Not Predominate.......................................... 18

      (a)  *No misrepresentations were made*.................................. 20

      (b)  *Representations were not material.*...............................20

      (c)  *Alleged "misrepresentations" were not uniform.* ...........23

   2.  Reliance and Consumer Perception of "Made in the USA" Requires an Individual Inquiry ...................................................................... 27

D.  Plaintiffs' Claims Are Not Typical .........................................................28

i

   E.  Plaintiffs Do Not Adequately Represent Class ............................... 31

   F.  Plaintiffs' Damages Model Is Unreliable ...............................33

**IV. OPPOSITION TO REQUEST FOR JUDICIAL NOTICE** .......................35

**V.   MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS** ........... 36

  A.  Legal Standard ........................................................36

  B.  Professor Kysar's Opinions Should Be Excluded .........................37

     1.  Professor Kysar Is Not A "Qualified" Expert ............................... 37

     2.  Professor Kysar's Opinions Do Not Rely On Any Actual Facts............... 38

     3.  Professor Kysar Does Not Base His Opinions On Reliable Methods Or Processes ......................................................... 40

     4.  Professor Kysar's Opinions Are Merely Speculative And Subjective ....... 44

  C.  Mr. Weir's Opinions Should Be Excluded.............................. 47

     1.  Mr. Weir Is Not A "Qualified" Expert................................. 47

     2.  Mr. Weir's Survey Concept And Structure Fails To Address The Relevant Damages Issue ........................................ 49

        (a)  *Mr. Weir failed to identify what consumers' expectations were* ............ 50

        (b)  *Mr. Weir failed to correctly identify what consumers received* ............ 52

     3.  Mr. Weir's Survey Methodology Is Fundamentally Flawed ................ 54

        (a)  *Mr. Weir did not test the correct universe*................................ 54

        (b)  *Mr. Weir failed to replicate market conditions* ...................... 55

        (c)  *Mr. Weir's survey is fundamentally biased* ........................... 57

        (d)  *Mr. Weir fails to properly account for supply side factors* .................. 59

**VI. CONCLUSION** ........................................ 60

ii

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION    17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Algarin v. Maybelline, LLC,*
    300 F.R.D. 444 (S.D. Cal. 2014) ................................................................. 13, 22

*Am. Booksellers Ass'n. v. Barnes & Noble, Inc.,*
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ........................................................... 54

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ........................................................................................ 17, 18

*Bates v. United Parcel Serv., Inc.,*
    511 F.3d 974 (9th Cir. 2007) ........................................................................... 11

*Berger v. Home Depot USA, Inc.,*
    741 F.3d 1061 (9th Cir. 2014) ......................................................................... 18

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ........................................................................... 34

*Bodner v. Oreck Direct, LLC,*
    No. C 06-4756 MHP, 2007 U.S. Dist. LEXIS 30408
    (N.D. Cal. Apr. 25, 2007) ................................................................................ 32

*Branca v. Nordstrom, Inc.,*
    No. 14cv2062-MMA (JMA), 2015 U.S. Dist. LEXIS 99157
    (S.D. Cal. Mar. 19, 2015) ................................................................................ 35

*Brazil v. Dole Packaged Foods, LLC,*
    No. 12-CV-01831-LHK, 2014 U.S. Dist. LEXIS 157575
    (N.D. Cal. Nov. 6, 2014) .................................................................................. 57

*Briseno v. Conagra Foods Inc.,*
    844 F.3d 1121 (9th Cir. 2017) ......................................................................... 13

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ........................................................................................ 38, 54

*Claar v. Burlington N. R.R.,*
    29 F.3d 499 (9th Cir. 1994) ............................................................................. 44, 50

*Clark v. Citizens of Humanity, LLC*,
   97 F. Supp. 3d 1199 (S.D. Cal. 2015) ...........................................................11, 36

*Daubert v. Merrell Dow Pharm.*,
   509 U.S. 579 (1993)..............................................................36, 38, 40, 53

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ...........................................................9

*In re Easysaver Rewards Litig.*,
   737 F. Supp. 2d 1159 (S.D. Cal. 2010) ...............................................35

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ...........................................................36

*Engalla v. Permanente Med. Grp., Inc.*,
   15 Cal. 4th 951 (1997)...........................................................19

*In re Facebook, Inc., PPC Adver. Litig.*,
   228 F.D.R. 446, 461 (N.D. Cal. 2012) ...............................................51

*In re Foundry Resins Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ...............................................38

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)...........................................................41

*In re Genesisintermedia, Inc.*,
   No. CV 01-9024-SVW, 2007 U.S. Dist. LEXIS 95253
   (C.D. Cal. June 28, 2007) ...........................................................34

*In re Google AdWords Litig.*,
   No. 5:08-CV-3369-EDJ, 2012 WL 28068 (N.D. Cal. Jan. 5, 2012)...................51

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ...........................................................17, 18

*Harrison v. Howmedica Osteonics Corp.*,
   No. CIV 06-0745 PHX RCB, 2008 U.S. Dist. LEXIS 26197
   (D. Ariz. Mar. 27, 2008) ...........................................................38, 54

*Hodes v. Vans Int'l Foods*,
   No. CV 09-01530 RGK, 2009 U.S. Dist. LEXIS 72193
   (C.D. Cal. July 23, 2009) ...........................................................23

iv
NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

*In the Matter of iSpring Water Systems, LLC*,
    Docket No. C-4611 ...................................................................................35

*Jinro Am. Inc. v. Secure Invs., Inc.*,
    266 F.3d 993 (9th Cir. 2001) ..................................................................37

*Jones v. ConAgra Foods, Inc.*,
    No. C. 12-01633 CRB, 2014 U.S. Dist. LEXIS 81292
    (N.D. Cal. June 13, 2014) .......................................................................15

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).................................................................................53

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
    No. C 12-03762 SI, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ......................54

*Kwikset Corp. v. Superior Court*,
    51 Cal. 4th 310 (2011) ............................................................................27

*Lee v. City of L.A.*,
    250 F.3d 668 (9th Cir. 2001) ..................................................................35

*Lucas v. Breg, Inc.*,
    212 F. Supp. 3d 950 (S.D. Cal. 2016) ...............................11, 16, 21, 34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................................................9

*Mad Rhino, Inc. v. Best Buy Co.*,
    No. CV 03-5604 GPS, 2008 U.S. Dist. LEXIS 8619
    (C.D. Cal. Jan 14, 2008) .........................................................................17

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ..............................................................9, 23

*Mezzadri v. Med. Depot, Inc.*,
    Case No. 14-CV-2330-AJB-DHB, 2015 WL 5107163
    (S.D. Cal. May 12, 2016)...................................................................19, 22

*Moheb v. Nutramas Labs, Inc.*,
    No. CV 12-3633-JFW, 2012 U.S. Dist. LEXIS 167330
    (C.D. Cal. Sept. 4, 2012) ........................................................................33

*Morin v. McCulloch Corp.*,
  No. CV 01-6431 SVW, 2002 U.S. Dist. LEXIS 28196
  (C.D. Cal. July 2, 2002)...........................................................................40

*Nguyen v. Medora Holdings, LLC*,
  No. 5:14-cv-00618-PSG, 2015 U.S. Dist. LEXIS 109125
  (N.D. Cal. Aug. 18, 2015) .........................................................................9

*Otto v. Abbot Labs. Inc.*,
  5:12-cv-01411-SVW-DTB, 2015 WL 9698992
  (C.D. Cal. Sept. 29, 2015) .......................................................................19

*Paz v. AG Goldschmeid, Inc.*,
  No. 14cv1372 DMS (DHB), 2014 U.S. Dist. LEXIS 156413
  (S.D. Cal. Oct. 27, 2014) .........................................................................11

*Pecover v. Elec. Arts Inc.*,
  No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632
  (N.D. Cal. Dec. 21, 2010)...................................................................40, 54

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*,
  No. CV 14-7242-DMG, 2016 U.S. Dist. LEXIS 149847
  (C.D. Cal. June 23, 2016) .........................................................................22

*In re POM Wonderful, LLC*,
  No. ML 10-02199 DDP, 2014 U.S. Dist. LEXIS 40415
  (C.D. Cal. Mar. 25, 2014)...................................................................14, 34

*Red v. Kraft Foods, Inc.*,
  No. CV 10-1028-GW(AGRx), 2012 U.S. Dist. LEXIS 186948
  (C.D. Cal. Apr. 12, 2012) .........................................................................14

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,
  181 F.3d 410 (3d Cir. 1999) .....................................................................35

*Sandoval v. Pharmacare US, Inc.*,
  No. 15-cv-0738-H-JLB, 2016 U.S. Dist. LEXIS 140717
  (S.D. Cal. June 10, 2016).............................................................................9

*Schaefer v. Overland Exp. Family of Funds*,
  169 F.R.D. 124 (S.D. Cal. 1996) ..............................................................29

*Schwartz v. Harp*,
  108 F.R.D. 279 (C.D. Cal. 1985) ...........................................................................29

*Schwartz v. Upper Deck Co.*,
  183 F.R.D. 672 (S.D. Cal. 1999) ...........................................................................29

*Shalaby v. Irwin Indus. Toll Co.*,
  No. 07CV2107-MMA (BLM), 2009 U.S. Dist. LEXIS 129812
  (S.D. Cal. July 28, 2009) ......................................................................................37

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ...........................................................19, 27, 28

*Stone v. Advance Am., Cash Advance Ctrs. Inc.*,
  278 F.R.D. 562 (S.D. Cal. 2011) ..........................................................................36

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) ..................................................................56

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ...................................................................................27, 28

*U.S. v. Jones*,
  29 F.3d 1549 (11th Cir. 1994) ..............................................................................35

*U.S. v. Redlightning*,
  624 F.3d 1090 (9th Cir. 2010) .............................................................................52

*U.S. v. Rushing*,
  388 F.3d 1153 (8th Cir. 2004) ......................................................................39, 54

*In re Vioxx Class Cases*,
  180 Cal. App. 4th 116 (2009) ...............................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..............................................................................................18

*Walker v. Woodford*,
  454 F. Supp. 2d 1007 (S.D. Cal. 2006) ................................................................35

*Werdebaugh v. Blue Diamond Growers*,
  No. 12-CV-02724-LHK, 2014 U.S. Dist. LEXIS 173789
  (N.D. Cal. Dec. 15, 2014) ....................................................................................59

**Statutes**

Cal. Bus. & Prof. Code § 17500, *et seq.* ("False Advertising Law")..........1, 5, 11, 19

Cal. Bus. & Prof. Code § 17533.7 ......................................................................1, 5, 11

Cal. Civ. Code § 17204 ("Unfair Competition Law")..............................1, 10, 11, 19

Cal. Civ. Code § 1750, *et seq.* ("Consumer Legal Remedies Act")...............1, 11, 19

**Other Authorities**

62 Fed. Reg. 63756 ..............................................................................................44

FED. R. CIV. P. 23 ...........................................................................................*passim*

FED. R. EVID. 201 .................................................................................................35

FED. R. EVID. 702...........................................................................................*passim*

W. Rubenstein, *Newberg on Class Actions*, § 3.3 (5th ed. 2012) ...........................13

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

## I.     INTRODUCTION

Defendant New Balance Athletics, Inc. ("New Balance"), by and through its undersigned counsel, hereby opposes Plaintiffs' motion to certify a class consisting of California purchasers of New Balance shoes identified as "Made in the USA" ("Motion") (ECF No. 49) for their claims against New Balance under California's False Advertising Law ("FAL") (Cal. Bus. & Prof. Code § 17500, *et seq.*), California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750, *et seq.*), Cal. Bus. & Prof. Code § 17533.7, California's Unfair Competition law ("UCL") (Cal. Bus. & Prof. Code § 17204), and for breach of express warranty, negligent misrepresentation, and unjust enrichment.

New Balance is the only major manufacturer of athletic shoes that has maintained its commitment to domestic manufacturing, employing more than 1,300 American workers in domestic factories that manufacture high-quality, premium footwear in multiple factories in this country.  The company truthfully markets its athletic shoes, providing complete and accurate information regarding the nature of its domestic manufacturing.  Class certification is not appropriate because absent class members lack standing for the claims at issue; the named Plaintiffs lack standing for certain aspects of the claims asserted; the putative class is overbroad and not ascertainable, lacks commonality, and typicality; and, common claims do not predominate.  The named Plaintiffs will not adequately represent class members because they are not individuals who were dissatisfied with the products they purchased, but rather are individuals who were solicited for this litigation by counsel.  Moreover, Plaintiffs have not offered a damages model adequate to calculate damages consistent with their theory of harm on a class-wide basis. Finally, a New Balance expert conducted a survey of putative class members, which demonstrated the complete absence of any merit to Plaintiffs' underlying claims.

New Balance also opposes Plaintiffs' Request for Judicial Notice in Support

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

of Motion for Class Certification ("RJN") (ECF No. 53) to the extent it requests anything more than judicial notice of the fact that certain documents exist in the public record.

Finally, New Balance moves this Court to exclude the opinions and testimony of Plaintiffs' experts Douglas A. Kysar and Colin B. Weir.  Professor Kysar's report is devoid of any facts, data, reliable methods, or application thereof relevant to the issues presented in this lawsuit and he lacks expertise or specialized knowledge that will assist the trier of fact in this particular matter.  And, while Mr. Weir may be an economist by trade, he fails to properly and reliably apply economic principles and survey methods to determine the alleged damages at issue in this litigation, nor does he show that such calculation is possible on a class-wide basis.

Pursuant to the Honorable M. James Lorenz United States District Judge Standing Order for Civil Cases, these four memoranda of law are being submitted together in one Omnibus Memorandum.  *Id.* at 2-3.

## II.    STATEMENT OF FACTS

### A. <u>New Balance's Commitment to U.S. Manufacturing</u>

New Balance is a privately held company based in Boston, Massachusetts, and controlled by Jim Davis and his family, who purchased the company in 1972, when it consisted of six employees making thirty pairs of shoes daily out of the company's facilities in Watertown, Massachusetts.  Declaration of Bradley D. Miller in Support of New Balance's Omnibus Memorandum ("Miller Decl."), ¶¶ 3, 4.  At the time, the company specialized in running shoes made in varying widths, and sold the products largely to school track programs, through mail-order, and at local athletic facilities.  Miller Decl. at ¶ 5.  The timing, and the focus on the quality of the New Balance athletic shoes, positioned the company well for the running boom that hit the United States in the 1970s.  *Id.*

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

In the 1980s, as workers' salaries and domestic manufacturing costs put financial pressure on the athletic shoe industry, manufacturers began off-shoring production largely to Asian countries where labor costs were significantly lower than in the United States.  New Balance, too, shifted some of its manufacturing overseas.  Miller Decl. at ¶ 6.  New Balance and Jim Davis, however, maintained a commitment to keeping a portion of its manufacturing in the United States, and keeping manufacturing jobs in this country.  Ex. 1,[1] Bradley D. Miller Deposition Transcript ("Miller Tr."), 6:3-17, 142:11-24; Miller Decl. at ¶ 7.  New Balance owns five manufacturing facilities throughout New England, where American workers prepare, cut, and mold materials and components of athletic shoes; and sew, press, and assemble those materials and components into the final product.  Ex. 1, Miller Tr. 54:9-19; Miller Decl. at ¶ 8.  New Balance is currently the only major athletic shoe manufacturer that maintains any factories in the United States.  Ex. 1, Miller Tr. 142:20-24; Miller Decl. at ¶ 10.

New Balance's U.S. factories are not mere assembly stations: materials are prepared, cut, stitched, and crafted to manufacture athletic shoes of the highest quality.  Miller Decl. ¶ at 11.  New Balance factories employ more than 1,300 American workers, and domestic suppliers to New Balance factories employ more than 5,000 additional American workers.  Ex. 1, Miller Tr. 48:9-11; Miller Decl. ¶¶ at 12, 13.  Where certain parts of shoes (most often the soles of the shoes) cannot be manufactured in the United States for a variety of reasons, those parts are imported and incorporated into the final manufactured product.  Miller Decl. at ¶ 17.

New Balance has remained committed to U.S. manufacturing and its American workers even though the profit margins on the shoes manufactured in the U.S. are significantly lower than those made in other countries.  Miller Decl. at ¶ 14.

---

[1] Unless otherwise noted herein, "Ex. X" refers to an exhibit attached to the Declaration of Laura B. Najemy in Support of New Balance's Omnibus Memorandum, filed herewith.

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

1  Because New Balance is a privately held company, its leadership has the freedom to

2  advance certain socially conscious goals, including maintaining this commitment.

3  Miller Decl. at ¶ 15.  Indeed, Plaintiffs' own expert suggested that if New Balance

4  were a public company, it would not be able to engage in this type of activity that

5  does not benefit overall profitability.  Ex. 2, Douglas A. Kysar Deposition

6  Transcript ("Kysar Tr."), 105:1-107:20.

7  **B. <u>New Balance's Truthful, Qualified Marketing</u>**

8  Consistent with its commitments as a good corporate citizen, New Balance

9  fully discloses the nature of its domestic manufacturing to its consumers.  New

10  Balance expressly notifies its customers that, "Manufactured in the US for over

11  75 years and representing a limited portion of our US sales, New Balance

12  MADE is a premium collection that contains a domestic value of 70% or

13  greater."  *See*, *e.g.*, Ex. 3, Sample New Balance Print Advertisement.[2]  This

14  and similar language is ubiquitous throughout the materials accompanying a

15  New Balance "Made in the USA" shoe and New Balance's advertising, and

16  appears on:

17
18  - The hangtag attached to every pair of "Made in the USA" labeled shoes that leave one of New Balance's five domestic manufacturing facilities (*see* Ex. 4, Hangtag);

19
20  - The New Balance website in multiple iterations and locations (*see* Ex. 5, New Balance Website, MADE);

21
22  - In-store advertising, (*see* Ex. 6, Sample In-Store Advertisements);

23  - Print advertising, (*see* Ex. 3, Sample Print Advertisements);

24  - Digital advertising copy (*see* Ex. 7, Screenshot of Sample Digital Advertisement); and

25
26  - The bottom of every shoebox labeled "Made in the USA" (*see* Ex. 8, Photograph of "Made in the USA" Shoebox).

27  ───────────────
[2] Where a pair of shoes is created in the United States but the domestic value is less

28  than 70%, New Balance labels the shoes "Assembled in USA."  Miller Decl. ¶ 19.

4

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

For the purposes of this Opposition, when New Balance refers to its shoes that are labeled "Made in the USA" it means those shoes that have been marketed with the qualified "Made in the USA" claim that clearly discloses the amount of domestic value contained in the shoes.

Plaintiffs do not dispute that New Balance has manufacturing plants in the United States, and that those factories employ over 1,300 workers. Plaintiffs do not dispute that the shoes that New Balance labels as "Made in the USA" actually contain at least 70% domestic value. Nor do plaintiffs dispute that New Balance qualifies its "Made in the USA" claims by prominently disclosing that New Balance's "Made in the USA" shoes contain at least 70% domestic value. Rather, Plaintiffs assert that *some* purchasers (including named Plaintiffs) may not see the qualifications provided by New Balance, or, even if they see the qualifications, they may not "internalize" them sufficiently. *See* Memorandum in Support of Plaintiffs' Motion for Class Certification ("Class Mem."), p. 15 (ECF No. 60). As a result, Plaintiffs assert that New Balance's use of the phrase "Made in the USA" on its labels violates Cal. Bus. & Prof. Code §§ 17533.7 and 17500, *et seq.* because the use of "Made in the USA" is deceptive to consumers even when qualified by New Balance's disclosures. Yet Plaintiffs do not assert or provide any method to ascertain how many members of the class failed to see the disclosures qualifying New Balance's "Made in the USA" claims, or how many members of the class saw the disclosures and failed to internalize them.

## C. Most Class Members Were Not Influenced By "Made In The USA" Claims

In order to determine whether the proposed class is appropriate, it is important to consider how—if at all—the members of the proposed class were actually affected by the claims at issue. In order to investigate that, New

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

Balance's expert Hal Poret conducted a survey of 300 California residents who, since 2015, actually purchased New Balance shoes that were labeled "Made in the USA."  *See* Declaration of Hal L. Poret in Support of New Balance's Omnibus Memorandum, attaching Expert Report of Hal Poret ("Poret Report"), filed herewith.  The purposes of the survey were (1) to assess whether class members were influenced by the claims, and (2) to determine whether those influenced by the claims believe that New Balance's manufacturing practices met their expectations in purchasing a shoe that, in their view, qualified as having been made in the United States.

As an initial matter, the survey revealed that the majority of putative class members' purchases were not influenced by any domestic manufacturing claims.  First, respondents were asked to name all factors or reasons they could think of that influenced their decision to purchase the New Balance shoes they had purchased.  *Id.* at 6.  In this open-ended format, only six of the 300 respondents (2%) indicated that they purchased the shoes, in any part, because they were made domestically.  *Id.* at 13.  Then, all respondents were given a list of possible factors that could have influenced their purchase, which included "Shoe is made in the U.S.A.," and asked to identify all that applied to their purchase.  *Id.* at 7-8.  Of the 300 respondents, even when prompted with this language as a possible factor, only 86 (28.7%) indicated that this was a factor at any level in their purchasing decision.  *Id.* at 13.  That means that more than 70% of all members of the asserted class are entirely indifferent to any "Made in the USA" claim made by New Balance, qualified or not.  *Id.*

### D. <u>Most Class Members' "Made In The USA" Expectations Are Met By 70% Domestic Value</u>

Even among those members of the asserted class who self-reported that they were influenced to purchase the shoes in part by the fact that they were

1  made in the United States, very few felt that the shoe is not genuinely "made"

2  in this country if 70% of the value of the shoe comes from domestic sources.

3  *Id.* Those respondents to the survey who reported that they were influenced by

4  the fact that the shoes were made in the United States were then informed that

5  New Balance labels its shoes "Made in the USA" where the domestic value is

6  at least 70%. *Id.* at 11. Those respondents were then asked whether, based on

7  how they understood "Made in the USA" *at the time they purchased their*

8  *shoes*, they consider a shoe for which 70% of the value comes from U.S.

9  content and labor to be genuinely Made in the USA. *Id.* Only nine

10  respondents (3% of all surveyed class members) indicated that they do not

11  consider 70% domestic value to properly qualify as "made" in the United

12  States. *Id.* at 13. And only one surveyed class member (0.3%) reported that

13  they would not have purchased the shoes had they known that they contained

14  70% domestic value. *Id.* at 13-14. This evidence is in direct contradiction to

15  the named Plaintiffs' extraordinary beliefs that "Made in the USA" must mean

16  100% domestic content and labor.

17        **E.  <u>Named Class Members</u>**

18       Named Plaintiffs in this case are not individuals who independently felt

19  wronged by having purchased products that failed to meet their expectations and

20  sought legal advice to address that wrong. Rather, they are individuals who were

21  solicited for this litigation through targeted social media advertisements that led

22  them to a class action website trolling for potential plaintiffs. *See* Ex. 9, Sherryl

23  Jones Deposition Transcript, ("shn"), 17:2-20:7; Ex. 10, Sheila Dashnaw Deposition

24  Transcript ("Dashnaw Tr."), 18:16-20:6, 26:5-29:25; Ex. 11, William Meier

25  Deposition Transcript ("Meier Tr."), 22:24-26:4.

26       Nor did any of the named Plaintiffs purchase the shoes because of the "Made

27  in the USA" representation; they purchased the shoes for other reasons. Ms. Jones

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

testified that she purchased the shoes because her doctor recommended them as helping a medical condition for her knees and back. Ex. 9, Jones Tr. 40:13-41:7. Similarly, Ms. Dashnaw purchased them because a co-worker gave a similar recommendation based on her doctor's advice. Ex. 10, Dashnaw Tr. 39:16-40:3. Mr. Meier purchased them after examining them and trying them on and concluding that they were comfortable and of a higher quality than other athletic shoes. Ex. 11, Meier Tr. 49:18-21, 68:13-22. The most that the named Plaintiffs would say was that they liked the idea of supporting American workers, and that the shoes were made domestically was probably the reason they were higher quality. *See*, *e.g.*, Ex. 11, Meier Tr. 68:8-22; Ex. 12, Plaintiffs' Response to Defendant New Balance Athletics, Inc.'s First Set of Interrogatories ("Pls. Interrog. Resp."), pp. 5-6 ("Dahsnaw purchased these shoes because she thinks they are comfortable, particularly because they come in a wide foot size, which fits her feet . . . and she liked the idea of supporting the United States"; "Meier purchased these shoes because he liked their style, they were comfortable and they came in a wide size, and he liked the fact that they were made in the USA"; "Jones . . . decided to buy the made in the USA New Balance shoes because she thinks they are comfortable, likes their style, and because they are made in the USA").

And, importantly, none of the named Plaintiffs felt that the shoes disappointed them. All of them found the shoes to be among the most comfortable, highest quality shoes that they had ever worn. *See* Ex. 9, Jones Tr. 52:7-17; Ex. 10, Dashnaw Tr. 52:25-53:18; Ex. 11, Meier Tr. 55:10-18.

## III. OPPOSITION TO CLASS CERTIFICATION

Plaintiffs' Motion should be denied for six main reasons: (1) Plaintiffs and absent class members lack standing to bring certain of these claims; (2) the class, as contemplated, is not ascertainable; (3) common questions of law and fact do not predominate over individual issues; (4) Plaintiffs' claims are not typical of the class;

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

(5) Plaintiffs are not adequate representatives of the class, and, (6) Plaintiffs' damages model is unreliable, not sufficiently tied to their theory of harm, and unable to calculate class-wide damages.  With the exception of ascertainability, each of these reasons alone justifies denial of Plaintiffs' Motion.

### A.      Plaintiffs and Absent Class Members Lack Standing For Claims

### 1.      Absent Class Members May Lack Standing.

Plaintiffs have failed to prove that absent class members have standing under Article III to seek relief.  Plaintiffs' Motion ignores Ninth Circuit precedent requiring proof of injury to all class members, instead focusing solely on an argument that the named Plaintiffs have standing.  *Compare Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (holding that "no class may be certified that contains members lacking Article III standing.") (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)); *with* Class Mem. at 7 (ECF No. 60).  Article III standing requires proof of an injury in fact that is (1) concrete and particularized, (2) fairly traceable to the challenged conduct of the defendant, and (3) redressable by a favorable decision.  *See Sandoval v. Pharmacare US, Inc.*, No. 15-cv-0738-H-JLB, 2016 U.S. Dist. LEXIS 140717, at *20 (S.D. Cal. June 10, 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Mazza*, 666 F.3d at 594-95.  Importantly, at the class certification stage, Article III standing must be shown through evidentiary proof rather than merely alleged. *Nguyen v. Medora Holdings, LLC*, No. 5:14-cv-00618-PSG, 2015 U.S. Dist. LEXIS 109125, at *12 (N.D. Cal. Aug. 18, 2015).

Plaintiffs seek certification of the following class:

All persons located within the State of California who purchased any New Balance shoe model labeled as made in the United States through a retail outlet or through the New Balance website at any time beginning four (4) years prior to the filing of this action on December 27, 2016 and ending at the time this action settles or proceeds to final judgment.

Class Mem. at 1 (ECF No. 60).  As defined, however, this class inherently encompasses members who lack Article III standing, *i.e.*, individuals who have not suffered an injury in fact.  For example, the class includes, at least, the following potential groups of unharmed individuals: (1) people who never saw the "Made in the USA" label prior to purchase; (2) people who were not influenced by, or who did not consider, the "Made in the USA" label in deciding to purchase these shoes; and, (3) people who saw the "Made in the USA" label, but also read and understood the 70% domestic value language on the hangtag, shoebox, advertising, and/or website prior to purchase.  Because the members of these subgroups lack standing to bring the claims raised in Plaintiffs' First Amended Class Action Complaint ("Amended Complaint") (ECF No. 16), the class as defined cannot be certified.

The Poret Report demonstrates that the vast majority of class members did not consider the "Made in the USA" labeling in deciding to purchase the shoes. Poret Report at 13 (finding that: (1) only 2% of respondents *sua sponte* identified "Made in the USA" as a factor that influenced or contributed to their decision to purchase the New Balance shoes at issue, and (2) even when prompted, only 28.7% of respondents selected "Made in the USA" as a factor).  *Id.*  Furthermore, only one out of 300 potential class members surveyed reported that they did not believe that 70% domestic content qualified as a "Made in the USA" designation and would not have purchased the shoe if he or she had known that was the threshold used by New Balance in labeling its shoes.  *Id.* at 13-14.  In light of this evidence, and in the absence of any evidentiary proof of injury to absent class members, Plaintiffs have not met their burden of proof with respect to the standing of absent of class members.

Plaintiffs may argue, though they have not yet, that class standing can be found under the UCL in the absence of injury if the labeling was "unlawful." However, New Balance's "Made in the USA" claim is qualified by the language

1   found on the hangtag and shoebox, and throughout its advertising and website,

2   which states that "[w]here the domestic value is at least 70%, we have labeled the

3   shoe 'Made in USA,'" s*ee* Exs. 3, 4, 5, and 8, and therefore it is not in violation of

4   Cal. Bus. & Prof. Code § 17533.7, which applies solely to unqualified claims.  *See*

5   *Paz v. AG Goldschmeid, Inc.*, No. 14cv1372 DMS (DHB), 2014 U.S. Dist. LEXIS

6   156413, at *14 (S.D. Cal. Oct. 27, 2014) (finding that Cal. Bus. & Prof. Code §

7   17533.7 "is silent on qualified labels … and thus fails to provide any guidance on

8   whether such labels would violate the law"); *Clark v. Citizens of Humanity, LLC*, 97

9   F. Supp. 3d 1199, 1208 (S.D. Cal. 2015) (finding that "§ 17533.7 allows for the use

10   of qualified 'Made in the U.S.A.' labels").

11   **2.   Plaintiffs Lack Standing To Seek Injunctive Relief.**

12   To the extent Plaintiffs seek injunctive relief, which they appear to in Counts

13   I (FAL), II (CLRA), and IV (UCL) of the Amended Complaint, they must establish

14   a likelihood of future injury to themselves.  *See Bates v. United Parcel Serv., Inc.*,

15   511 F.3d 974, 985 (9th Cir. 2007) (plaintiff must show that "he has suffered or is

16   threatened with a concrete and particularized legal harm … ***coupled with a***

17   ***sufficient likelihood that he will again be wronged in a similar way***.") (emphasis

18   added) (internal quotations and citations omitted); *Lucas v. Breg, Inc.*, 212 F. Supp.

19   3d 950, 962-63 (S.D. Cal. 2016) (plaintiff must establish a "real and immediate

20   threat of repeated injury") (internal quotations and citations omitted).  Plaintiffs

21   have failed to make any such showing with respect to themselves or any absent class

22   members and, as such, certification of a class seeking injunctive relief is improper.[3]

23   As an initial matter, there is no question that, to the extent that any of the

24   named Plaintiffs were to consider purchasing the shoes again, they would be doing

25   _____

26   [3]In fact, Plaintiffs fail to even argue in their Class Mem. that they have standing to
bring claims for injunctive relief on behalf of themselves or the class.  Indeed, the

27   entirety of Plaintiffs' discussion of standing consists of one sentence alleging that
they purchased the shoes because they believed they were "Made in the USA" and

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION   17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

1   so having been fully advised of the qualifications to New Balance's "Made in the

2   USA" claims—*i.e.*, that New Balance labels its shoes as "Made in the USA" where

3   the domestic value equals at least 70%.  Therefore, any potential future purchase

4   would not be the result of their reliance on a false statement.

5          In order to overcome this obvious standing defect, in each of their

6   declarations in support of Plaintiffs' Motion, the named Plaintiffs summarily assert

7   that he/she would "consider purchasing New Balance made in the USA labeled

8   shoes in the future if New Balance were to truthfully disclose the actual domestic

9   and foreign content of the shoes, and price the shoes accordingly."[4]  *See*, *e.g.*,

10  Declaration of Sheila Dashnaw in Support of Plaintiffs' Motion for Class

11  Certification (Dashnaw Decl.), ¶ 9 (ECF No. 60-19).  However, this statement

12  hardly supports an inference that the named Plaintiffs are imminently likely to be

13  injured by New Balance's alleged misrepresentations.  The deposition testimony of

14  the named Plaintiffs clarified that (1) each of the named Plaintiffs takes the

15  extraordinary position that "Made in the USA" means 100% domestic labor and

16  content—a position not in line with the current state of the law, (2) each of the

17  named Plaintiffs is now aware of and understands the 70% domestic value

18  representation with respect to New Balance shoes marketed as "Made in the USA,"

19  and (3) none of the named Plaintiffs has a present intent to purchase another pair of

20  these shoes.  *See* Ex. 10, Dashnaw Tr. 77:1-13, 80:16-81:7, 82:16-20; Ex. 11, Meier

21  Tr. 21:13-23:3, 72:16-73:19, 74:12-75:7; and Ex. 9, Jones Tr. 22:22-23:9, 50:25-

22  52:4, 57:16-60:3; 68:20-69:8.  At this point, not only do the named Plaintiffs have

23  no present intention of purchasing New Balance shoes marketed as "Made in the

24

25  knowingly paid more for the shoes because of that representation and a second
    sentence summarily concluding they have standing.  Class Mem. at 7 (ECF No. 60).

26  [4] This statement is incomprehensible.  New Balance already truthfully discloses the

27  actual domestic value of its shoes by stating that it is at least 70%.  Plaintiffs do not
    challenge that disclosure as untruthful.

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

1   USA," any decision to purchase those shoes would be with a full understanding that

2   the shoes contain 70% or greater domestic value.

3           **B.**    <u>**The Class Is Not Ascertainable**</u>

4         A class must be adequately defined and clearly ascertainable before a class

5   action may proceed.  *See Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 454 (S.D.

6   Cal. 2014) ("A class is sufficiently defined and ascertainable if it is administratively

7   feasible for the court to determine whether a particular individual is a member.")

8   (citations omitted).  Plaintiffs' class definition is inappropriate because (1) it is

9   unfeasible to identify all potential class members, and (2) the class definition is

10  overbroad and imprecise.  While Plaintiffs attempt to argue that the class is

11  ascertainable because "members can be identified based on objective criteria, such

12  as the product they purchased, the date of the purchase, and the location of the

13  purchase," Class Mem. at 7, Plaintiffs have failed to prove that such criteria are in

14  fact knowable, identifiable, or ascertainable here and for the reasons set forth below

15  any such self-identification is likely to be problematic, to say the least.[5]

16          **1.**    **Identification Of Class Members Is Unfeasible.**

17        It is not administratively feasible to identify the potential members of the

18  class as Plaintiffs have defined it because such identification necessarily requires (1)

19  self-identification by the purported class members and (2) an inquiry into whether

20  any such individuals have suffered an injury in fact (*i.e.*, whether they were actually

21  misled by New Balance's qualified "Made in the USA" claim).  *See* W. Rubenstein,

22  *Newberg on Class Actions*, § 3.3 (5th ed. 2012) ("Administrative feasibility means

23

24

---

25  [5] Plaintiffs overstate the holding of *Briseno v. Conagra Foods Inc.*, 844 F.3d 1121,
1125-26 (9th Cir. 2017), claiming that it is no longer a requirement in the Ninth

26  Circuit, at the certification stage, that plaintiffs show an administratively feasible
way to identify class members.  Class Mem. at 7.  What the Ninth Circuit held was

27  that a lack of administrative feasibility ***alone*** should not prevent certification.
*Briseno*, 844 F.3d at 1126 (emphasis added).

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION     17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

1    that identifying class members is a manageable process that does not require much,

2    if any, individual factual inquiry.").

3         ***First***, self-identification likely will be necessary here.  New Balance is largely

4    a wholesaler that sells the vast majority of its shoes to third-party retail stores.

5    Miller Decl. at ¶ 25.  As such, New Balance does not receive or have access to any

6    identifying information whatsoever regarding the end-consumers who purchase

7    shoes from those third-party retailers.  *Id.*  New Balance only receives and retains

8    identifying customer information for online sales through its website and in-store

9    sales to New Balance loyalty members and email list subscribers at (1) New Balance

10   owned brick and mortar stores, of which there are only eight in California and, (2) to

11   a limited degree, licensed New Balance brick and mortar stores, of which there are

12   only six in California.  *Id.* at ¶ 26.  To date, Plaintiffs have not requested or

13   conducted discovery to uncover whether any third-party retailers retain such

14   necessary records.

15        While self-identification may be appropriate in some cases, here it is likely to

16   be unreliable and unwieldly.[6]  As an initial matter, it is unlikely that purported class

17   members retained receipts relating to their purchase of New Balance shoes labeled

18   "Made in USA."  *See Red v. Kraft Foods, Inc*., No. CV 10-1028-GW(AGRx), 2012

19   U.S. Dist. LEXIS 186948, at *16 (C.D. Cal. Apr. 12, 2012) ("[C]ases where self-

20   identification alone has been deemed sufficient to render a class ascertainable

21   generally involve situations where consumers are likely to have retained receipts …

22   where the relevant purchase was a bigticket item … or where the defendant would

23   have access to a master list of either consumers or retailers who dealt with the items

24   at issue.") (citations omitted); *see also In re POM Wonderful, LLC*, No. ML 10-

25   02199 DDP (RZx), 2014 U.S. Dist. LEXIS 40415, at *23 (C.D. Cal. Mar. 25, 2014)

26

27   _____
     [6] For the same reasons, the class as proposed fails the fourth factor for
     superiority/manageability under Rule 23(b)(3).

28
     NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION        17cv00159
     FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
     NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

(citations omitted) (denying certification where purported class members were unlikely to have retained receipts or other transaction records). In fact, even the three named Plaintiffs were unable to locate and provide receipts or other records to show that they purchased each of the shoes they claim to have purchased at the prices they claim to have paid. *See* Ex. 11, Meier Tr. 32:5-8, 41:24-25; Ex. 10, Dashnaw Tr. 46:16-47:3, 54:5-16; Ex. 9, Jones Tr. 37:19-38:13.

The testimony of at least one of the named Plaintiffs further demonstrates the inherent unreliability of individuals' memories and the impracticability of self-identification here. *Compare* Ex. 10, Dashnaw Tr. 37:9-13 (Q: So how many pairs of New Balance shoes have you purchased in the last five years? A: Approximately four. Q: Four? A: Four or five. Yeah.) *with* Ex. 12, Pls. Interrog. Resp., p. 4 ("Plaintiff Dashnaw purchased approximately five pairs of New Balance Made in USA shoes…"), and p. 5 (listing approximately six purchases). Based on these purportedly "representative" examples, it is evident that self-identification here will be impractical.[7]

**Second**, as discussed *supra* (Section III.A.1), in order to determine whether an absent class member has standing under Article III, the Court must inquire into whether such an individual has suffered an injury in fact. Any such inquiry would likely involve questions, at the very least, of whether the individual (a) saw the "Made in the USA" label; (b) actually considered or was influenced by the "Made in

---

[7] Self-identification may be further complicated by the fact that New Balance sells hundreds of different models of shoes—only some of which are marketed as "Made in the USA"—and without receipts or the shoes themselves, it is unlikely that absent class members will be able to recall the exact model number of the shoe purchased and whether it was labeled "Made in the USA." *See. e.g., Jones v. ConAgra Foods, Inc.*, No. C. 12-01633 CRB, 2014 U.S. Dist. LEXIS 81292, *38 (N.D. Cal. June 13, 2014) (finding class to be unascertainable and noting that "[a]lthough this Court might be persuaded that a class of 'all people who bought Twinkies,' for example, during a certain period, could be ascertained – one would at least have more confidence in class members' ability to accurately self-identify – the variation in the Hunt's products and labels makes self-identification here unfeasible.").

the USA" label; (c) saw and considered the "Made in the USA" label, but also read

and understood the 70% domestic value language on the hangtag, shoebox,

advertising, and/or website prior to purchase; or, (d) saw and considered the "Made

in the USA" label and may not have seen the accompanying disclosures, but was

nevertheless not misled because his or her perception or expectation of "Made in the

USA" was something less than 100%.  This necessary factual inquiry makes

certification inappropriate here.  *See Lucas*, 212 F. Supp. 3d at 974 (finding that

administrative feasibility was not met where inquiries would need to be made into

putative class members' memories of the circumstances surrounding their use of the

product resulting in "mini trials").

### 2.       The Class Definition Is Overbroad And Imprecise.

The class also is not ascertainable because the class definition is overbroad,

vague, ambiguous, and imprecise.  It is overbroad because it very likely includes

individuals who were not injured, and who therefore lack standing, including

individuals who (a) did not see the "Made in the USA" labeling; (b) saw the "Made

in the USA" labeling but did not consider it in making their purchasing decision; (c)

saw and considered the "Made in the USA" labeling, but who also saw and

considered the accompanying 70% domestic value language disclosed on the

hangtag, shoebox, advertisements and/or website; or, (d) who saw and considered

the "Made in the USA" label but have a more realistic notion of what "Made in the

USA" means than the named Plaintiffs here (*i.e.*, that "Made in the USA" means

something less than 100% domestic content and labor).  *See supra* Section III.A.1.

In fact, the Poret Report shows that at least 70% of the individuals in his survey—all

potential class members—did not consider whether the shoe was "Made in the

USA" in deciding whether to purchase it and therefore could not have been injured.

Poret Report at 13.

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION       17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

1    The class definition is vague, ambiguous, and imprecise in that it fails to

2    make clear exactly which persons "located within the State of California" would in

3    fact be class members.  *See*, *e.g.*, *Mad Rhino, Inc. v. Best Buy Co.*, No. CV 03-5604

4    GPS (AJWx), 2008 U.S. Dist. LEXIS 8619, at *9-13 (C.D. Cal. Jan 14, 2008)

5    (denying certification where class definitions were vague and unascertainable).  It is

6    entirely unclear what "located" means in this context, and whether an individual

7    must (a) reside in the State of California, or have resided in the State of California

8    during the class period; (b) have purchased a pair of New Balance shoes labeled as

9    "Made in the USA" in the State of California during the class period; or, (c) both

10    reside(d) and have purchased a pair of New Balance shoes labeled in "Made in the

11    USA" in the State of California during the class period.

12    **C.    Plaintiffs Fail To Meet The Strict Requirements Of Rule 23**

13    A party seeking to certify a class must demonstrate that is has met all four

14    requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4)

15    adequacy.  *See* FED. R. CIV. P. 23(a).  Plaintiffs' purported class fails at least three[8]

16    of these requirements: commonality, typicality (*see infra* Section III.D), and

17    adequacy (*see infra* Section III.E).  In addition, because Plaintiffs seek certification

18    under Rule 23(b)(3), they must prove (1) that the questions of law or fact common

19    to class members predominate over any questions affecting only individual members

20    and (2) that a class action is superior to other available methods for fairly and

21    efficiently adjudicating the controversy.  *See* FED. R. CIV. P. 23(b)(3).  Rule

22    23(b)(3)'s predominance standard requires a stronger showing by Plaintiffs than

23    Rule 23(a)'s "commonality" standard.  *See Hanlon v. Chrysler Corp.*, 150 F.3d

24    1011, 1019 (9th Cir. 1998); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

25

26    _____

    [8] Plaintiffs' purported class may very well also fail the numerosity requirement, as

27    survey evidence makes clear that the vast majority of class members were not
    actually misled or injured, but for the purposes of this Opposition, New Balance is
    not challenging the class on that ground.

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION     17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

623 (1997) ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."). Plaintiffs have not met their burden to show that common questions of law or fact predominate over individual issues here and, as explained above (*see infra* Section III.B), there are likely to be exceptional difficulties in managing this as a class action.  Because Plaintiffs' greatest hurdle, and fatal flaw,[9] is their lack proof that common issues predominate here, New Balance takes up that issue first, followed by their failure to prove typicality and adequacy.

### 1.    Common Issues Do Not Predominate.

To make a determination regarding predominance, the Court must analyze each claim separately.  *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (citation omitted).  If significant elements of a claim or defense require individualized proof from each class member, class certification is inappropriate.  *Amchem*, 521 U.S. at 624-25.  As set forth below, significant elements of each of Plaintiffs' claims require individualized proof from each class member.  Thus, the class should not be certified.

As an initial matter, accepting Plaintiffs' pleadings as accurate, different class members were exposed to different "Made in the USA" claims.[10]  There is no question, given the number of times and different places New Balance identifies the 70% value qualification, at least some (likely many, if not most) class members

---

[9] For the same reasons set forth herein, Plaintiffs' proposed class fails to meet the standard for commonality required under FED. R. CIV. P. 23(a).  Commonality requires that "the class members have suffered the same injury."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (internal quotation and citation omitted).  While "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class," *Hanlon*, 150 F.3d at 1019, as demonstrated below, Plaintiffs' own record and deposition testimony make clear that they were not exposed to the same representations that absent class members may have been, and that therefore they are unlikely to have suffered the same injury.

[10] New Balance believes that its qualifications are so ubiquitous that nearly all putative class members would have been exposed to them, but reserves that position.

1  were exposed to and understood New Balance's *qualified* Made in the USA claims.

2  Plaintiffs claim that they did not.  That means that, accepting Plaintiffs' assertions,

3  for different class members, how and in what number the representations were

4  observed by a particular individual, and the extent to which New Balance's qualified

5  representations were relied upon, differ from class member to class member.  As a

6  result, common issues about the representations to which class members were

7  exposed (and how and how many times they were exposed), and upon which they

8  allegedly relied, do not predominate.

9       While Plaintiffs may be correct that, under California law, reliance on the part

10  of absent class members need not be shown at the class certification stage, in a FAL,

11  UCL, or CLRA action,[11] a presumption of reliance is appropriate ***only*** upon a

12  showing that "(1) the misrepresentation was material; and (2) the class as a whole

13  was exposed to it."  *Mezzdari v. Med. Depot, Inc.*, Case No. 14-CV-2330-AJB-

14  DHB, 2015 WL 5107163, at *5 (S.D. Cal. May 12, 2016).  Under California law, a

15  misrepresentation is material "if a reasonable [person] would attach importance to

16  its existence or nonexistence in determining his choice of action in the transaction in

17  question."  *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010)

18  (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997)).  "If

19  the misrepresentation … is not material as to all class members, the issue of reliance

20  'would vary from consumer to consumer' and the class should not be certified."

21  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011) (quoting *In*

22

---

23  [11] Each of these claims, though comprised of different elements, are treated the same under California law for the purposes of class certification.  *See Otto v. Abbot Labs.*

24  *Inc.*, 5:12-cv-01411-SVW-DTB, 2015 WL 9698992, at *5 (C.D. Cal. Sept. 29, 2015) ("For the purposes of class certification, the UCL, FAL, and CLRA are

25  materially indistinguishable.") (citations omitted).  And, Plaintiffs' negligent misrepresentation claim should also be treated the same for the purposes of class

26  certification.  *See id*. (finding that the same analysis applies to a negligent representation claim) (citations omitted).  Plaintiffs' unjust enrichment claim is

27  duplicative of its statutory claims and therefore should be dismissed or, at the very least, should rise and fall with the statutory claims for class certification purposes.

28

*re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009)).  Because the alleged "misrepresentations" here were not in fact "misrepresentations," the Court need not reach the test for a presumption of reliance identified above.  Should the Court disagree and find the test necessary, however, the alleged "misrepresentations" were (a) not material and/or (b) not uniformly made.

### (a)   *No misrepresentations were made.*

As an initial matter, New Balance disputes that any "misrepresentations" were made to its California purchasers.  As set forth above, *see supra* Section II, Plaintiffs do not dispute that New Balance has manufacturing plants in the United States, and that it employs over 1,300 American workers to manufacture shoes in this country. Plaintiffs do not dispute that the shoes New Balance markets as with a qualified "Made in the USA" representation actually contain at least 70% domestic value. Nor do Plaintiffs dispute that New Balance qualifies its "Made in the USA" claims by disclosing, on hangtags affixed to shoes, on shoeboxes, in all advertisements, and throughout its website, that where the domestic value of the shoe is at least 70%, it has been labeled "Made in the USA."  As a result, Plaintiffs cannot show that New Balance—in labeling its shoes in this manner and conscientiously including clear language that discloses the nature of its domestic manufacturing to its consumer— has made any affirmative, or negligent, misrepresentations to its consumers.  Thus, no class should be certified.

### (b)   *Representations were not material.*

As demonstrated by Mr. Poret's survey, only a small percentage of California consumers who purchased New Balance shoes labeled as "Made in the USA" in fact attached any importance whatsoever to that label.  *See* Poret Report at 13 (finding that more than 70% of respondents were not influenced by the fact that the shoes were "Made in the USA" when making their decision to purchase).  The survey was designed to ask two initial questions to illicit any and all factors or reasons that

respondents could recall that influenced their decision to purchase the New Balance shoe.[12] *Id.* at 5-8.  The first question was open-ended and allowed respondents to write in all factors that they could recall that influenced their decision to purchase the New Balance shoe.  *Id.* at 6-7.  Only 2% (6 out of 300 respondents) indicated that "Made in the USA" influenced their decision to purchase.  *Id.* at 13.  In contrast, the following factors were overwhelmingly found to have played a part in respondents' decision to purchase the shoe: (1) look/style/color/design (55.7%); (2) comfort/feel (50.3%); (3) price/sale/store availability (45.3%); and, (4) fit/size/width (33.3%).  *Id.* at 31.  Comparatively, "Made in the USA" ranked second to last.  *Id.* A follow up question was then asked which provided respondents with a list of possible factors that may have contributed to their decision to purchase the shoes— this included "Shoe is made in the U.S.A."  *Id.* at 31-32.  While a greater number of respondents selected the "Made in the USA" option when it was presented in this list (28.7%), it was still in the bottom half of survey responses.  *Id.* at 32.  Again, the most influential factors were: (1) comfort of the shoe; (2) fit of the shoe; (3) look or style of the shoe; and (4) price of the shoe.  *Id.*  In light of these results, it is more accurate to say that the average reasonable consumer would not attach much, if any, importance to the label "Made in the USA" in this particular instance and therefore it is hardly "material."  *See Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 157.

Additionally, where multiple factors play into an individual's decision to purchase a product, a finding of materiality is likely inappropriate.  *See Lucas*, 212 F. Supp. 3d at 969 (finding that issues of materiality and reliance were not subject to generalized proof, but instead "each [purchaser]'s decision-making calculus was dependent upon a variety of information and circumstances specific to the

---

[12] By the time survey respondents were asked this question the respondent pool had been narrowed to only those respondents who had purchased a New Balance shoe marketed as "Made in the USA" and they were being asked about their purchase of that specific shoe model.  *Id.* at 15-23.

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION            17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

individual."); *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. CV 14-7242-DMG (KSx), 2016 U.S. Dist. LEXIS 149847, at *24-5 (C.D. Cal. June 23, 2016) (finding that the question of materiality was not susceptible to class-wide proof where evidence showed that consumers made purchases of the products at issue based on a variety of factors); *Mezzadri*, 2016 WL 5107163, at *6  ("[I]n light of the evidence showing that a sizeable percentage of the putative class did not consider the representations at issue, the Court finds the issue of materiality in this case is not subject to common proof."); *Algarin*, 300 F.R.D. at 457 (finding that plaintiffs failed to demonstrate that the elements of materiality and reliance were subject to common proof where survey results showed that purchasers had a variety of expectations for the product at issue and where there were varying factors influencing purchasing decisions and consumer satisfaction).

Plaintiffs' expert Colin B. Weir attempts to prove through a conjoint survey that a reasonable consumer would attach enough importance to the "Made in the USA" label in this context that it would generate a "price premium," however, as explained in detail below in Section V.C and in the Expert Report of Sarah Butler ("Butler Report") (attached to the Declaration of Sarah Butler in Support of New Balance's Omnibus Memorandum, filed herewith), Mr. Weir's analysis is fatally flawed and his results are unreliable and irrelevant to the questions raised in this case.  And, as explained in detail below in Section V.B and in the Poret Report and Butler Report, Plaintiffs' other expert, Professor Kysar, similarly attempts to opine—with no evidentiary basis—that the representations made by New Balance in connection with its shoes marketed as "Made in the USA" are likely to confuse or deceive New Balance's customers.  *See* Poret Report at 38-42; Butler Report at ¶¶ 72-73, 80.  Neither of these purported expert reports support any claim that the alleged misrepresentations here were "material" such that they would justify the presumption of reliance on a class-wide basis.

22

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS                    17cv00159

1

**(c)** *Alleged "misrepresentations" were not uniform.*

"[A] presumption of reliance does not arise when class members 'were exposed to quite disparate information from various [sources].'" *Mazza*, 666 F.3d at 595-96. "While proof of individual reliance may not be necessary to assert claims under the FAL and UCL … [c]ourts in the Ninth Circuit and in California have regularly found that where such inquiries predominate over common questions … courts may refuse to certify a class action." *Hodes v. Vans Int'l Foods*, No. CV 09-01530 RGK (FFMx), 2009 U.S. Dist. LEXIS 72193, at *13 (C.D. Cal. July 23, 2009) (internal citations omitted).

There are numerous possibilities as to what absent class members (1) had the opportunity to be exposed to, (2) were in fact exposed to, (3) actually read, and (4) actually "internalized" prior to purchasing a pair of New Balance shoes marketed as "Made in the USA." For example, an individual could have seen (or not seen) any of the following: (1) an advertisement for any number of New Balance shoes marketed as "Made in the USA," which would have included the 70% qualifying language; (2) a hangtag prominently disclosing the qualifying language attached to a shoe on display in a brick and mortar retail store; (3) a hangtag prominently disclosing the qualifying language attached to a shoe in a shoebox that was brought to the individual to try on in a brick and mortar retail store; (4) representations on the New Balance website relating to its line of "Made in the USA" shoes; (5) the physical "Made in the USA" labels on the shoes themselves; and/or, (6) the disclosure printed on the bottom of the physical shoebox. Because of the widespread variety of experiences that class members may have had with respect to their exposure to New Balance's qualified "Made in the USA" representations, it is impossible to know which individuals, if any, were in fact misled or deceived by New Balance's advertising. Such great disparity in potential exposure and understanding further demonstrates that class certification is inappropriate here.

Indeed, so does a review of Plaintiffs' own record:

**_The Hangtags_**.  Plaintiffs do not dispute that New Balance affixes a hangtag to each pair of shoes that are labeled "Made in the USA" as part of the packaging process.  Ex. 1, Miller Tr. 46:22-48:22; Miller Decl. at ¶ 22.  Plaintiffs do not dispute that the hangtag states:

> This pair of shoes was made in one of our American factories, by some of our 1,300 American workers.  These shoes were produced by our U.S. workforce using imported and domestic materials.  At times, due to availability, economic or quality reasons, there is a need to import materials from foreign sources.  Where the domestic value is at least 70%, we have labeled the shoe "Made in USA."

Ex. 4.  However, each Plaintiffs' experience with the hangtag was different.  *See*, *e.g.*, Ex. 9, Jones Tr. 33:13-23 ("Q: Going back to the purchase that you made of the 990 shoes in May of 2016, do you recall whether there was a cardboard tag on the shoe when you bought it? A: No, I don't.  I wore the shoes out of the store.  I went in that particular day because my feet hurt.  So I — there was no tag on the shoes when I got the shoe.  Q: Okay.  A: I don't know if the clerk took it off, but no."), 50:25-51:5 ("Q: You've been given a document that's been marked Jones' Exhibit 6, and I'll ask you if you've ever seen – well, I'll represent that these are two sides of a single hangtag.  Have you ever seen this before?  A: No."); Ex. 10, Dashnaw Tr. 48:14-24 ("Q: And did the shoes they brought out have a hang tag on them?  A: Yes.  Q: What do you recall about that hang tag?  A: It looked like a little flag. Flag says "Made in USA."  Q: And did you flip over that hang tag at all --  A: No.  Q: -- to read what it said?  A: No.")[13]; Ex. 11, Meier Tr. 44:17-23 ("Q: Okay.  And is that the tag that you were just referring to that was on the shoe, the display model shoe?  A: Yes.  Q: Did you ever flip that tag over to read it?  A: No.").  At least two of the

---

[13] Ms. Dashnaw's testimony also suggests that the hangtag she saw on the first pair of New Balance shoes labeled as "Made in the USA" that she purchased was an earlier version of the hangtag that had additional language, but still included the 70% value qualification.  Ex. 10, Dashnaw Tr. at 49:14-23; *see* Miller Decl. ¶ 24.

named Plaintiffs were presented with the opportunity to read additional information that would have clarified and qualified the "Made in the USA" labeling present on the shoe itself, however neither chose to do so.  And, in fact, Plaintiffs' own expert acknowledged during his deposition that a purchaser of New Balance "Made in the USA" labeled shoes could have seen the qualification language set forth on the hangtag (or elsewhere) 50 times, five (5) times, or not at all prior to purchasing, Ex. 2, Kysar Tr. 99:5-100:2, and that it would take a mere five seconds to read that very same language, *id.* 119:1-18.

Plaintiffs' deposition testimony demonstrates that there is no consistency or commonality with respect to individuals' shopping experiences.  While Plaintiffs have put forth no evidence to dispute the fact that every pair of New Balance shoes labeled as "Made in the USA" leaves the manufacturing facilities with a hangtag affixed, to the extent Plaintiffs claim that they or some of the class members did not see the hangtag or read the hangtag at the point of sale, this merely demonstrates a lack of commonality in consumers' shopping experiences.  Put simply, in the record that Plaintiffs have put forth no commonality or predominance can be found.

***The Advertising.***  Plaintiffs also do not dispute that New Balance's advertising of its "Made in the USA" labeled shoes consistently contains language that is similar, if not identical, to the following:

> Manufactured in the US for over 75 years and representing a limited portion of our US sales, New Balance MADE is a premium collection that contains a domestic value of 70% or greater.

Ex. 3. Some, but not all, of the Plaintiffs recalled seeing a print or television advertisement prior to purchasing a pair of New Balance shoes labeled "Made in the USA," though none could say whether the advertisement directly related to "Made in the USA."  *See* Ex. 10, Dashnaw Tr. 40:19-23; 52:3-6 (saw no ads before purchasing first pair); Ex. 9, Jones Tr. 49:8-13 (recalls seeing ad in Runners Magazine for New Balance shoes); Ex. 11, Meier Tr. 36:20-37:2 (recalls seeing

television ad indicating New Balance sold wide sizes).  Some, but not all, of the Plaintiffs recalled seeing "Made in the USA" signage hanging at the store from which they purchased their shoes.  *See* Ex. 11, Meier Tr. 17:3-22 (recalls banner with flag above the shoes); Ex. 10, Dashnaw Tr. 50:4-13, 56:10-16 (no "Made in the USA" signage at store); Ex. 9, Jones Tr. 29:10-12, 29:22-30:17 (no recollection of "Made in the USA" signs at store in 2016, but recalls a runner sign with an American flag on it in 2008).  Again, as Plaintiffs do not dispute that New Balance's advertisements relating to its "Made in the USA" shoes contain a clear disclosure of the 70% domestic value, the record as set forth simply reflects a lack of commonality among Plaintiffs and class members relating to what they in fact paid attention to, read, or internalized with respect to this advertising.

**_Website Purchases._**  Plaintiffs do not dispute that New Balance expressly qualifies its "Made in the USA" labeling and discloses the 70% domestic value standard on its own website regarding its "Made in US" collection, and elsewhere:

> Manufactured in the US for over 75 years and representing a limited portion of our US sales, New Balance Made is a premium collection that contains a domestic value of 70% or greater.

Ex. 5.  This representation is displayed throughout the website, including when an individual goes to purchase a pair of shoes.  *See* Ex. 13, New Balance Website, 990v4 Product Page.  To the extent Plaintiffs claim that website purchasers do not see this language, this is again evidence of lack of commonality in the consumers' shopping experience.

**_The Shoebox._**  Similarly, Plaintiffs do not dispute that the shoebox that New Balance's shoes labeled as "Made in the USA" are packaged in contains the following language on the bottom of the box: "Where the domestic value is at least 70%, we label our shoes 'Made in the USA.'"  Ex. 8.  While the disclosure is on the bottom of the box, in light of the other consistent and prominent ways in which the

1   qualification is clearly and repeatedly provided to consumers, it is additional

2   evidence of the prevalence of the qualification.

3                           *       *       *

4           The record shows that Plaintiffs and class members are more than likely to

5   have disparate experiences and perceptions relating to the purchase of New

6   Balance's "Made in the USA" labeled shoes, resulting from a range of exposure to

7   New Balance's qualified claims through marketing, advertising, its website, and the

8   shoes themselves.  As such, class certification is improper.

### 2.       Reliance and Consumer Perception of "Made in the USA" Requires an Individual Inquiry.

11          Plaintiffs assert that causation and reliance can be established on a class-wide

12  basis because the California Supreme Court found that "Made in the USA" claims

13  are material under *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011), and

14  material misrepresentations are presumed to cause reliance on a class-wide basis

15  under *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) and *Stearns v. Ticketmaster*,

16  655 F.3d 1013 (9th Cir. 2011).  Class. Mem. at 12-13 (ECF No. 60).  However, in

17  *Kwikset* the California Supreme Court merely recognized that "Made in the USA"

18  claims *could* be material.  "In particular, *to some consumers*, the 'Made in U.S.A.'

19  label matters."  *Kwikset,* 51 Cal. 4th at 329 (emphasis added).

20          Moreover, Plaintiffs' own expert concedes that a determination of how

21  consumers perceive the phrase "Made in the USA," and whether they were misled,

22  would require an "individualized fact-specific inquiry" – making clear that common

23  issues of fact and law cannot possibly predominate over individuals issues here:

> **Q:** … you didn't conduct a study or experiment to determine whether
> any consumer was actually misled, correct?

> **A**: I did not conduct an experiment to determine whether any consumer
> was actually misled, because ***that seems like an individualized and***

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION          17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

*fact-specific question* that was not in the nature of – or in the scope of my assignment at this preliminary stage."

*See* Ex. 2, Kysar Tr. 50:1-9 (emphasis added).  This admission itself demonstrates the inappropriateness of class certification here.

And to the extent that *In re Tobacco II* and *Stearns* establish either a "presumption" or an "inference" of materiality on a class-wide basis, that presumption is clearly rebutted by Mr. Poret's survey, which shows that the vast majority of California consumers who purchased the New Balance "Made in the USA" labeled shoes did not rely on, and were in fact not misled by New Balance's labeling.  *See* Poret Report at 13-14.

Finally, it is clear from the multitude of permutations of an individual's potential exposure (or non-exposure) to the various placements of New Balance's qualified claim and disclosure of 70% domestic value that reliance simply cannot be presumed here.  *See Stearns*, 655 F.3d at 1020 ("We do not, of course, suggest that predominance would be shown in every California UCL case.  For example, it might well be that there was no cohesion among the members because they were exposed to quite disparate information …").  Relatedly, the corresponding multitude of perceptions of, and ultimately reliance on, any of those representations show that individual issues of fact and law far outweigh any common, class-wide issues.  Class certification should therefore be denied for failure to meet Rule 23(b)(3)'s predominance standard, and likewise commonality under Rule 23(a)(2).

### D.   Plaintiffs' Claims Are Not Typical

While it is clear that Plaintiffs have failed to meet the burden of proof under Rule 23(b)(3) for predominance, and for that reason alone the Court may deny certification, Plaintiffs also fail to meet Rule 23(a)'s requirement of typicality. Plaintiffs argue that typicality is satisfied because the Plaintiffs and putative class members all purchased New Balance shoes that were labeled "Made in the USA," containing "as little as 70 percent domestic content" and that they were therefore

injured.  Class Mem. at 9 (ECF No. 60).  But Plaintiffs' purported "reliance" on the "Made in the USA" label in making their purchase decision is not typical of a general consumer, and therefore not typical of the class and does not support certification.  As Mr. Poret found in his survey of 300 California residents who had purchased at least one pair of New Balance shoes that were labeled "Made in the USA" since 2015, only a small percentage of purchasers even considered the fact that the shoes were "Made in the USA" when deciding to purchase.  Poret Report at 13 (finding that at most 28% of respondents were potentially influenced by the fact that the shoe was "Made in the USA").  And in fact, the emphasis placed on this purported reliance in the Amended Complaint and Plaintiffs' Motion is belied by the Plaintiffs' own deposition testimony.

In order to assess whether or not the named Plaintiffs' claims are typical, the Court must examine "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985); *see also* FED. R. CIV. P. 23(a)(3) ("the claims or defenses of the representative parties are typical of the claims or defenses of the class").  As discussed at length above, *see supra* Section III.C, Plaintiffs and class members have not suffered the same or similar injury, nor are other class members likely to have been injured by the same course of conduct.  Instead, the alleged wrongful conduct appears to be fairly unique to these Plaintiffs. *See Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 683 (S.D. Cal. 1999) ("[T]he court should look at … whether the allegedly wrongful activity is not unique to named plaintiffs") (quoting *Schaefer v. Overland Exp. Family of Funds*, 169 F.R.D. 124, 128-29 (S.D. Cal. 1996)).

First and foremost, Plaintiffs have taken an "all-or-nothing" view of the phrase "Made in the USA."  *See* Ex. 9, Jones Tr. 15:23-17:1; Ex. 10, Dashnaw Tr.

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

17:2-18:12; Ex. 11, Meier Tr. 21:13-22:23 (each testifying that it is their belief that for something to be considered "Made in the USA" it must be 100% made in the United States—including all factories, workers, and materials). This extraordinary position professed by all three named Plaintiffs is not only inconsistent with state and federal law, it also makes clear that these Plaintiffs are not typical of the vast majority of class members in their beliefs. See Poret Report at 13 (finding that only 3% of the 300 people surveyed would not consider 70% domestic value to properly qualify as "Made in the USA"). When assessed in comparison to the survey data collected by Mr. Poret, and plain common sense, Plaintiffs' assumptions and actions, or rather inaction, appear highly suspect and certainly not typical of the prospective class.

Additionally, these beliefs are not only contrary to California and Federal law, they are at odds with named Plaintiffs' own view of other products that they consider to be "Made in the USA." For example, Ms. Jones testified that she believes a Jeep Wrangler may be "Made in the USA," despite the fact that parts of the car may be made overseas:

> **Q:** Okay. And in the same way that you think about New Balance, do you believe that means that all of the parts that go into that car are also made in the United States?
>
> **A:** I haven't given that – given that much thought, but I figured that it was all assembled here, but I hadn't compared the car to shoes.
>
> **Q:** Okay. So for instance, if it turns out that some of the car was – some of the parts of the car were made overseas but then it was imported and then assembled and all of the assembly was done in the United States, would you still consider that to be sort of a "Made in the USA" car?
>
> **A:** I haven't considered that. It depends on what percentage, I guess. Because it's a huge difference between a car and some shoes. So it's an interesting question.

Ex. 9, Jones Tr. 79:2-80:9; *see also* Ex. 10, Dashnaw Tr. 83:12-14 ("Q: And what made you believe that the Chevy Camaro was made in the United States?  A: Because the GM Company is [in the] United States.").  And in their responses to discovery requests, each of the Plaintiffs listed several items that they believed to be "Made in the USA" that are similarly not 100% "Made in the USA."  *See*, *e.g.*, Ex. 12, Pls. Interrog. Resp., pp. 7-8 (*Dashnaw*: Chevrolet Camaro, Visio television; *Meier*: Chevrolet Camaro; *Jones*: Jeep Wrangler, Dodge Ram, Chevy Monte Carlo).

Additionally, despite the fact that the language explaining the "Made in the USA" label was available to them in a variety of forms prior to purchasing these shoes, the named Plaintiffs claim that they (1) either did not see or failed to read the hangtag affixed to the pair of shoes they purchased, (2) were not exposed to any advertisements or did not notice the 70% language included in advertisements that they did see, and/or (3) did not do any research into the shoes prior to purchasing or did research but claim not to have seen any of the 70% language that is present on New Balance's website, and on at least some third-party retailer websites.  *See supra*, Section III.C.  Plaintiffs have introduced no evidence that suggests that this complete inattention to marketing language is typical of purchasers of these shoes.

### E.   <u>Plaintiffs Do Not Adequately Represent Class</u>

Finally, Plaintiffs also fail to meet the requirements under Rule 23(a) for adequacy.  Most importantly, the three named Plaintiffs were not motivated to purchase New Balance shoes labeled as "Made in the USA" because of that label, and therefore can hardly have been harmed by that label.  See Ex. 9, Jones Tr. 38:22-41:7 (describing purchase of Women's 990s in 2015, noting no recollection of "Made in the USA" signage in the store and that this particular shoe model had been recommended by her orthopedist); Ex. 10, Dashnaw Tr. 39:16-40:1 ("Q: [H]ow did you first learn about New Balance sneakers?  A: From a coworker…. Q: And what did your coworker tell you about New Balance shoes?  A: She said her doctor

recommended it for – she had the same knee problem I had."); Ex. 11, Meier Tr. 49:18-21 ("Q: [W]hat about the 990s did [you] like?  A: The fit.  Comfortable, wide. That was about it.").  To the extent that some absent class members were influenced by, and motivated to purchase the shoes because of, the "Made in the USA" label, Plaintiffs' claims are not reflective of those individuals, and as a result Plaintiffs' claims are likely subject to unique defenses and therefore they can hardly be adequate representatives of such a class.

Additionally, it was made clear in each of their depositions that Plaintiffs were not dissatisfied with their purchase(s) of New Balance shoes labeled "Made in the USA."  *See* Ex. 9, Jones Tr. 52:7-17; Ex. 10, Dashnaw Tr. 52:25-53:18; Ex. 11, Meier Tr. 55:10-18.  Instead, Plaintiffs' lawyers appear to be the driver behind this litigation and, in fact, advertised this lawsuit on the website topclassactions.com in order to troll for potential plaintiffs.  *See* Ex. 14, Meier Deposition Exhibit 1 (advertisement for class action against New Balance for "Made in the USA" shoes from December 2, 2016).  The website used by Plaintiffs' counsel even touts its ability to find clients for attorneys.  *See* Ex. 15, https://topclassactions.com/-attorneys/, last accessed November 1, 2017 ("Have a case in mind but don't have the clients? Advertise on Top Class Actions.").

Each of the Plaintiffs testified that after having seen an advertisement online (either through a popup on Facebook, in an email directly from topclassactions.com, or from speaking with their girlfriend), they filled out a form and were subsequently contacted by Plaintiffs' counsel, Aubry Wand, in December 2016.  *See* Ex. 9, Jones Tr. 17:2-20:7; Ex. 10, Dashnaw Tr. 18:16-20:6, 26:5-29:25; Ex. 11, Meier Tr. 22:24-26:4.  The initial Complaint was filed less than a month later on December 27, 2016.  Certification of a class formed in this manner—spawned by the desire of counsel to generate income and not to redress actual injury to Plaintiffs—is inappropriate and improper.  *See*, *e.g.*, *Bodner v. Oreck Direct, LLC*, No. C 06-4756

MHP, 2007 U.S. Dist. LEXIS 30408,  *7 (N.D. Cal. Apr. 25, 2007) (denying motion for class certification where plaintiff's counsel admitted he had researched the functionality of the air purifier at issue and then went in search of a plaintiff and holding that "[t]o grant class certification in such circumstances would be to place this court's imprimatur on litigation practices which it finds abhorrent and inconsistent with the standards of federal class action suits"); *see also Moheb v. Nutramas Labs, Inc.,* No. CV 12-3633-JFW (JCx), 2012 U.S. Dist. LEXIS 167330, at *15 (C.D. Cal. Sept. 4, 2012) (denying certification and finding that where counsel had been researching the possibility of a class action prior to plaintiff becoming a client, the adequacy prong was not met).

## F.   Plaintiffs' Damages Model Is Unreliable

As discussed in detail below in Section V.C, Plaintiffs' damages model is unreliable, disconnected from Plaintiffs' theory of harm, and inadequate to calculate damages on a class-wide basis.  Mr. Weir's survey concept and structure simply fails to address the relevant damages at issue here, and as such cannot be of use to the trier of fact.  While Mr. Weir admits that the goal of his model was to measure the difference in value between what a customer expected to receive and what they actually received, he: (a) failed to identify what customer expectations with respect to "Made in the USA" actually were, and (b) failed to correctly identify what those customers actually received.  As such, his model cannot properly evaluate this difference.  And despite his protestations, he cannot simply "fix" his model by making a slight tweak, because—as discussed at length above—customer expectations and perceptions of the phrase "Made in the USA" are highly variable. What is more, his survey is fundamentally flawed for at least four reasons: (1) he surveyed the wrong universe of individuals; (2) he failed to properly replicate market conditions; (3) his survey is biased and overly inflates the value of country of origin; and (4) he failed to account for supply side factors.

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

1   While Courts in the Ninth Circuit have held that "the amount of damages is
2   invariably an individual question [which] does not defeat class action treatment,"
3   *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975), "there is a distinction
4   between **the 'fact of damages**,' which is essentially a threshold question of
5   causation and injury in fact, and the 'amount of damages,' which involves an
6   assessment of damages due after resolution of common questions of liability."
7   *Lucas*, 212 F. Supp. 2d at 970 (emphasis added).  "This distinction is critical
8   because while determining the *amount* of damages does not defeat the
9   predominance inquiry, a proposed class action requiring the court to determine
10   individualized *fact* of damages does not meet the predominance standards of Rule
11   23(b)(3)." *Id.* (internal quotations and citations omitted).

12   Mr. Weir also improperly bases his price premium damages at least in part on
13   the assumption that New Balance prices its shoes based on rational, efficient market
14   decisions.  *See In re POM Wonderful, LLC*, 2014 U.S. Dist. LEXIS 40415, at *18
15   ("In an inefficient market, in contrast, some information is not reflected in the price
16   of an item.  In such a market, even a material misrepresentation might not
17   necessarily have any effect on prices. Absent such traceable market-wide influence,
18   and where, as here, consumers buy a product for myriad reasons, damages resulting
19   from the alleged misrepresentations will not possibly be uniform or amenable to
20   class proof.") (citing *In re Genesisintermedia, Inc*., No. CV 01-9024-SVW, 2007
21   U.S. Dist. LEXIS 95253 at *40-1 (C.D. Cal. June 28, 2007)).  But as explained
22   above, New Balance's decision to maintain its domestic manufacturing is likely not
23   a "rational, efficient market decision," as the operational costs are higher and
24   margins are lower; rather it is driven by the leadership's commitment to its
25   American workers.

26   For all of these reasons, class certification is particularly inappropriate here
27   and Plaintiffs' Motion should be denied.

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

1    **IV.    OPPOSITION TO REQUEST FOR JUDICIAL NOTICE**

2         Plaintiffs have requested that the Court take judicial notice of two documents:

3    (1) Exhibit A, Federal Trade Commission, *In the Matter of iSpring Water Systems,*

4    *LLC*, Docket No. C-4611; and (2) Exhibit B, Federal Trade Commission Advisory

5    Opinion Digests.  Judicial notice is appropriate for an adjunctive fact "that is not

6    subject to reasonable dispute because it: (1) is generally known within the trial

7    court's territorial jurisdiction; or (2) can be accurately and readily determined from

8    sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201.

9    However, a court may only take judicial notice of *undisputed* matters of public

10   record.  *See Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006)

11   (finding the proper subject matter for judicial notice to be "sources whose accuracy

12   cannot reasonably be questioned, for example, almanac, dictionary, calendar or

13   similar source") (quoting *U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).

14        New Balance does not dispute that the documents in question are part of the

15   public record.  However, judicial notice of public records does not extend to the

16   truth of the facts or legal opinions contained therein.  *See, e.g., Lee v. City of L.A.*,

17   250 F.3d 668, 690 (9th Cir. 2001) (noting that "when a court takes judicial notice of

18   another court's opinion, it may do so 'not for the truth of the facts recited therein,

19   but for the existence of the opinion, which is not subject to reasonable dispute over

20   its authenticity.'") (quoting *S. Cross Overseas Agencies, Inc. v. Wah Kwong*

21   *Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999)).[14]  As such, "the veracity

22   and validity" of the contents of these documents should not be judicially noticed.

23   *See, e.g., Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA (JMA), 2015 U.S. Dist.

24   LEXIS 99157, at *19 n.5 (S.D. Cal. Mar. 19, 2015) (taking judicial notice solely of

25

26   _____

     [14] *See also In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1166 (S.D. Cal.
27   2010) ("A district court cannot take judicial notice of a fact that is subject to
     'reasonable dispute' simply because it is contained within the public record.")
     (citation omitted).

28

1  the existence of another court's opinion); *see also Clark*, 97 F. Supp. 3d at 1202-03

2  (granting judicial notice of FTC opinions available in Federal Register only for the

3  existence of the matters, not for the truth of the matters within).

4  **V.      MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS**

5        The Court should exclude the opinions of Plaintiffs' experts Douglas A.

6  Kysar and Colin B. Weir, as set forth in their Declarations (ECF No. 60-22 ("Weir

7  Declaration"), ECF No. 60-23 ("Kysar Declaration"), and ECF No. 66 ("Weir

8  Supplemental Declaration")), because neither satisfies the requirements of FED. R.

9  EVID. 702 or *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).  Specifically,

10 Prof. Kysar relies on his "expertise" as a law professor to offer a speculative and

11 quasi-legal opinion that does not consider the facts of this case and is premised

12 entirely on irrelevant or unreliable academic literature.  For his part, Mr. Weir offers

13 a "conjoint survey" intended to illustrate a purported class-wide damages theory.

14 His opinion is not helpful to the trier of fact and unreliable because his survey poses

15 (and thus answers) the wrong question to the wrong people.

16             **A.      Legal Standard**

17       A proffered expert must, at a minimum, be qualified "by knowledge, skill,

18 experience, training, or education," to opine on a topic that will "help the trier of

19 fact understand the evidence or determine a fact at issue."  FED. R. EVID. 702.

20 Additionally, the opinions must be (1) "based on sufficient facts or data," (2) the

21 result of "reliable principles and methods," and (3) a reliable application of "the

22 principles and methods to the facts of the case."  *Id.*  The Court should consider

23 expert admissibility issues at the class certification phase.  *Stone v. Advance Am.,*

24 *Cash Advance Ctrs. Inc.*, 278 F.R.D. 562, 566 (S.D. Cal. 2011) ("[A] district court

25 should apply the *Daubert* evidentiary standard to evaluate the reliability of expert

26 testimony before turning to the rigorous Rule 23 analysis") (citing *Ellis v. Costco*

27 *Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

28

1

### B.    Professor Kysar's Opinions Should Be Excluded

2

Prof. Kysar's primary opinion offered is that consumers are likely to be

3

misled by New Balance's "Made in the USA" labeling because a "reasonable

4

consumer" would understand "Made in the USA" to mean all or substantially all of

5

the product is made in the United States.  "Kysar Decl. at ¶¶ 5, 38-9 (ECF No. 60-

6

23).  To support that opinion, he further opines that consumers seek out "Made in

7

the USA" sneakers, but are unlikely to read the entirety of New Balance's qualified

8

claim, and, even if they do, they are unlikely to understand and internalize it.  *Id.* at

9

¶¶ 38-9.  Prof. Kysar also opines that New Balance is attempting to trade on this

10

confusion.  *Id.*  Prof. Kysar's opinions and testimony should be excluded because:

11

(1) he is not qualified to offer any of the opinions he sets forth; (2) he failed to

12

consider any of the facts relevant to this matter; (3) he instead attempts to draw

13

conclusions from pre-existing research, which is either irrelevant, unreliable, or

14

contradicts his opinions; and, (4) his opinion is merely speculative.

15

### 1.    Professor Kysar Is Not A "Qualified" Expert.

16

As an initial matter, Prof. Kysar lacks the expertise to offer the opinions in his

17

report.  "The Ninth Circuit has defined this as the threshold issue in determining

18

whether a witness may come 'before the jury cloaked with the mantle of an expert[]'

19

under Rule 702, and has cautioned that 'care must be taken to assure that a proffered

20

witness truly qualifies as an expert, and that such testimony meets the requirements

21

of [that] Rule[.]'"  *Shalaby v. Irwin Indus. Toll Co.,* No. 07CV2107-MMA (BLM),

22

2009 U.S. Dist. LEXIS 129812, at *36 (S.D. Cal. July 28, 2009) (*quoting Jinro Am.*

23

*Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001)).  Prof. Kysar states

24

that he is an expert in "torts, consumer protection, products liability, and

25

environmental law."  Kysar Decl. at ¶ 8 (ECF No. 60-23).  Prof. Kysar further

26

describes his relevant expertise as behavioral law and economics.  *See* Ex. 2, Kysar

27

Tr. 17:7-18:16.  Despite his alleged expertise in behavioral law and economics, Prof.

28

37
NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

Kysar does not have an educational background in any of the fields that would generally be required to formulate these opinions. Specifically, Prof. Kysar does not have any substantive education or background in consumer perception (*id.* at 14:20-15:3), surveys or survey design (*id.* at 15:4-6), statistics or statistical analysis (*id.* at 15:7-22), or psychology (*id.* at 15:23-17:4).

While it is not always necessary to have a formal education in order to be considered an expert on a topic, Prof. Kysar also lacks the substantive, related experience to opine on consumer perception of "Made in the USA" labels, the importance of "Made in the USA" claims to consumers, or any other opinion made by Prof. Kysar in his declaration.  Prof. Kysar's academic experience in the area of country-of-origin is limited to a single paper he authored in 2004.  *See* Ex. 16, Douglas A. Kysar, *Preferences for Processes: The Process/Product Distinction and the Regulation of Consumer Choice*, 118 HARV. L. REV. 525 (2004) ("Kysar Article"); Ex. 2, Kysar Tr. 22:4-12; 23:16-20.  And even this paper only has a mere citation to a single article in a footnote.  Ex. 16, Kysar Article at 525 n.36; Ex. 2, Kysar Tr. 22:20-23:15.  Together all of these shortcomings make it clear that "even though [Kysar] might possess credentials to render some expert opinion, the trial court may, and perhaps must, exclude on grounds of disqualification any testimony that extends beyond the witness's demonstrated expertise." *In re Foundry Resins Antitrust Litig.*, 863 F. Supp. 2d 966, 995 (C.D. Cal. 2012) (internal quotations omitted).

### 2.     Professor Kysar's Opinions Do Not Rely On Any Actual Facts.

Prof. Kysar's opinions have no factual basis because he did not even attempt to determine any of the relevant facts.  *See Harrison v. Howmedica Osteonics Corp.*, No. CIV 06-0745 PHX RCB, 2008 U.S. Dist. LEXIS 26197, at *57 (D. Ariz. Mar. 27, 2008) (proffered expert testimony cannot be excessively speculative nor lack sufficient factual support) (citing *Daubert*, 509 U.S. at 595); *Brooke Grp. Ltd. v.*

*Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[W]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, . . . it cannot support a jury's verdict."); *U.S. v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004) ("Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable.").

Prof. Kysar admits that he ***did not do*** any of the following: conduct any empirical study, conduct any consumer interviews, conduct any interviews of anyone who bought a New Balance "Made in the USA" labeled shoe (Ex. 2, Kysar Tr. 40:25-41:13); consider any information about the named Plaintiffs (*id.* at 212:22-213:8); visit a New Balance store, or a store that sells New Balance "Made in the USA" products (*id.* at 41:14-25, 47:10-25, 96:12-15); go through the process of buying a "Made in the USA" New Balance sneaker (*id.* at 41:14-25); review the product packaging or look at a physical New Balance "Made in the USA" sneaker (*id.* at 47:10-48:6); visit a New Balance factory (*id.* at 62:13-18); or, ask for any information about New Balance's customers or the "Made in the USA" product line (*id.* at 46:3-16, 60:25-61:18, 62:7-13).

Prof. Kysar, accordingly, admits that he ***does not know*** any of the following: whether New Balance's "Made in the USA" labeling garners goodwill (*id.* at 238:22-239:2); whether those customers who purchased "Made in the USA" shoes actually cared that shoes were labeled as such (*id.* at 247:9-11, 238:5-10); what consumers' perceptions of quality with respect to "Made in the USA" shoes are (*id.* at 79:1-21, 149:2-151:22, 167:21-168:22); whether consumers sought out "Made in the USA" products (*id.* at 238:5-10); whether and what percent of consumers read the "Made in the USA" labeling (*id.* at 160:19-161:4, 270:14-25); whether and what percent of consumers understood the "Made in the USA" labeling (*id.* at 101:19-103:11, 234:2-24); why New Balance carries a "Made in the USA" line (*id.* at

45:22-46:2, 105:7-107:20); whether that product line is profitable (*id.* at 46:3-10); how many factories New Balance has in the United States or how many factory workers New Balance has in the United States (*id.* at 61:11-62:18); or, any demographic information about New Balance's customers (*id.* at 227:10-13).

Accordingly, Prof. Kysar has no factual basis to offer any opinion concerning what a consumer who purchased New Balance's "Made in the USA" shoes may or may not have seen, believed, or understood about New Balance's qualified labeling, whether that labeling is misleading, or New Balance's motivation for the labeling. His opinions should be excluded for failing to rely on a sufficient factual basis.

### 3.     Professor Kysar Does Not Base His Opinions On Reliable Methods Or Processes.

Rather than consider facts, Prof. Kysar relies exclusively on non-original studies and articles to formulate his opinions on consumer perception and the purported harm stemming from New Balance's qualified claims.  Even if that were an acceptable method by which to approach the question of whether consumers are misled by New Balance's labeling—it is not—the articles Prof. Kysar depends on are either irrelevant or unreliable.

Before an expert's opinion may be determined to be admissible, the court must "make a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid." *Daubert*, 509 U.S. at 600.  The absence of any discernable principles and methods in his report is a sufficient basis to exclude Prof. Kysar's declaration.  *See Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at *20 (N.D. Cal. Dec. 21, 2010) (finding expert opinion unreliable where no methodology was shown for relying on information and the "opinion [was] connected to existing data only by the *ipse dixit* of the expert"); *Morin v. McCulloch Corp.*, No. CV 01-6431 SVW (SHx), 2002 U.S. Dist. LEXIS 28196, at *14 (C.D. Cal. July 2, 2002) (excluding an expert in for failing to describe the methodology used to assess the effectiveness of warning labels).

***First***, it is unclear what "methods" Prof. Kysar used to determine which materials to rely on for his declaration.  Ex. 2, Kysar Tr. 40:8-20.  Prof. Kysar does not explain how he chose the studies he reviewed, or how he went about analyzing the relevance of the studies to the facts at issue.  In fact, there can be little doubt that Prof. Kysar applied no methodology whatsoever in the mere twelve hours he spent reviewing academic materials and creating and drafting his report.  *See* Ex. 2, Kysar Tr. 56:22-57:8 (answering that in total he spent approximately 12 hours on his report with no assistance).

***Second,*** nearly all the materials Prof. Kysar relies on are irrelevant to the key question: whether the putative class of consumers are misled by ***New Balance's*** qualified "Made in the USA" representations.[15]  Notably, none of the studies he relies on address: New Balance's specific, and qualified, "Made in the USA" claims (*id.* at 91:24-95:8, 108:17-109:3); "Made in the USA" claims on footwear (*id.* at 108:13-16); or, qualified "Made in the USA" claims generally (*id.* at 93:21-94:2, 260:20-261:2).  None of these studies address California consumers (*id.* at 109:4-25) and all of these studies are at least 10 years old (*id.* at 190:17-20).  Accordingly, none of the articles Prof. Kysar relies on provide any basis to offer an opinion on New Balance's qualified "Made in the USA" claim and the consumer perception of that language.[16]

---

[15] The majority of studies Prof. Kysar references focus on topics that are unrelated to the issues in this case, such as labor conditions (*i.e.*, sweatshops, forced child labor), Kysar Decl. ¶¶ 21, 23 (ECF No. 60-23), "moral taint" (*i.e.*, buying a Hitler-owned sweater, blood diamonds), *id.* at ¶ 23, and Kosher or Halal standards, *id.* at ¶ 22.  The few country of origin studies that Prof. Kysar cites do not address qualified "Made in the USA" labeling.  Those articles, instead, are directed to looking at feelings with respect to a country-of-origin claim (positive or negative), which Prof. Kysar acknowledges is an entirely different question than whether the country of origin drove a purchasing decision and to what degree.  *See* Ex. 2, Kysar Tr. 190:25-191:7.

[16] When relying on the studies of others, expert opinions that exceed the opinions within the original studies must be found unreliable.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145-47 (1997) (holding that when four original studies did not conclude causation to group, the study could not be relied upon to conclude causation in an unrelated individual).

**Third,** at best, Prof. Kysar relies on two articles related to "Made in the USA" labeling generally, but these studies are equally flawed and, even if considered reliable, actually contradict Prof. Kysar's opinions.  *See* Ex. 2, Kysar Tr. 38:17-39:13 (referencing the Maronick articles as two articles he cited that include studies directly relating to "Made in the USA" claims); *see generally* Ex. 17, Thomas J. Maronick, *An Empirical Investigation of Consumer Perceptions of "Made in USA" Claims*, 12 INTERNATIONAL MARKETING REVIEW 15, 29 (1995) ("Maronick 1995"); Ex. 18,  Thomas J. Maronick, *Country of Origin – Does It Matter Anymore?*, MARKETING IN TRANSITION: SCARCITY, GLOBALISM. & SUSTAINABILITY 271, 274 (Colin L. Campbell, ed., 2005) ("Maronick 2005") (together "the Maronick articles").

In addition to the failings noted above of **all** of the articles Prof. Kysar relies on, despite using the two Maronick articles as the cornerstone of his opinion about New Balance's labeling, Prof. Kysar fails to undertake any effort to determine the reliability of these studies.[17]  Prof. Kysar failed to review: any of the underlying survey instruments (*see* Ex. 2, Kysar Tr. 194:6-9); raw data (*id.* at 194:2-5); methodology or protocols, including the interview questions, stimulus, or representativeness of the sample (*id.* at 194:10-13); or, the geographic makeup of the sample (*id.* at 109:8-13).  Moreover, Prof. Kysar acknowledged that the Maronick surveys are mall intercept surveys, which have inherent flaws and limitations, including the fact that they did not simulate a purchasing situation. *Id.* at 213:23-215:5.[18]  And, the studies are ten and twenty-years old, respectively, which

---

[17] This is likely because he is not qualified to do so.  Prof. Kysar has minimal experience in survey and survey design. *See* Ex. 2, Kysar Tr. 15:4-6, 18:17-22:3.

[18] The first Maronick article Prof. Kysar relies on is from 1995, using data collected in 1990.  Ex. 17, Maronick 1995 at 18 ("The data were collected in Autumn, 1990.").  In his deposition, Prof. Kysar acknowledges that data from this long ago would be unreliable.  *See* Ex. 2, Kysar Tr. 207:23-208:11.

1   Prof. Kysar admits limits their reliability.  *See* Ex. 2, Kysar Tr. 207:23-208:11.

2   Thus, they provide no reliable basis for his purported opinions.

3        Even if these studies were reliable, the studies draw conclusions that

4   ***contradict*** Prof. Kysar's opinions:

- The Maronick 1995 study found that "Made in the USA" labeling is not an
  important factor for consumers when making a purchasing decision.  Ex.
  17, Maronick 1995 at 29 ("[T]he 'made in USA' cue was not important for
  either complex unfamiliar products or for simple, familiar products raises
  questions about the overall importance of country of origin claims.").

- Maronick's 2005 follow-up concludes that "Made in the USA" labeling is
  even less important then than it was in 1995.  Ex. 18, Maronick 2005 at
  274 ("[C]onsistent with prior empirical research, [Country-of-Origin]
  claims are among the least important factors in . . .  purchase
  decisions.").[19]

- "Made in the USA" claims do not necessarily convey a product has a
  positive attribute, such as higher quality, and in some instances more than
  half of consumers associate bad quality with "Made in the USA" labeled
  products.  *See* Ex. 17, Maronick 1995 at 29-30 ("[T]he addition of a 'made
  in USA' claim may be wasted.").[20]

- The importance of "Made in the USA" varies by product type.  Ex. 2,
  Kysar Tr. 219:12-17, 219:18-21, 219:22-25, 220:1-18, 220:19-22, 220:23-
  221:4, 221:5-15.

- The importance of Made in the USA varies by customer demographic.  *See*
  Ex. 17, Maronick 1995 at 28-29; *See* Ex. 2, Kysar Tr. 79:4-80:24.

20   Accordingly, these articles cannot provide a reliable basis for Prof. Kysar's opinions.

21        ***Fourth,*** Prof. Kysar ignored relevant research.  Specifically, Prof. Kysar did

22   not address (and appeared to not have even noticed prior to his deposition), the 1995

---

[19] Notably, Prof. Kysar agrees with Maronick's conclusion that "Made in the USA" labeling is unimportant.  *See* Ex. 2, Kysar Tr. 221:5-15.

[20] Maronick also concludes that perception of quality of the product varies inversely with the importance of the country of origin labeling, *i.e.*, for a product with a perception of high quality, the country of origin claim matters less.  Ex. 17, Maronick 1995 at 29-30.  Prof. Kysar, however, testified that he did not know the perception of quality of New Balance's product.  *See* Ex. 2, Kysar Tr. at 233:3-5.

43
NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

Attitude Survey results reported in in the FTC Guidelines directly addressing New Balance sneakers.  *See* 62 Fed. Reg. 63756, 63764.  Specifically, according to the Guidelines, that study concluded that "where a product was assembled in the United States, a significant majority of consumers agreed that a "Made in USA" claim would be appropriate if the product contained either 70% U.S. content (67% of respondents) or 90% U.S. content (75% of respondents)." *Id.*  Prof. Kysar, however, failed to consider this study at all in forming his conclusions, despite it being prominently discussed in one of the only three references related to "Made in the USA" claims that he relies on.  *See* Ex. 2, Kysar Tr. 199:23-200:12 ("Q: Would you want to see [the 1995 Attitude] survey in connection with forming your opinions in this case? . . . A: . . . So let me put it this way.  I would certainly look at the underlying survey as part of further analysis of this issue.").

Rule 702 requires that an expert's opinions be "the product of reliable principles and methods."  FED. R. EVID. 702(c).  Because Prof. Kysar failed to apply any discernable methodology or reliable process when formulating his opinions in this case Prof. Kysar's testimony should be excluded.

### 4. Professor Kysar's Opinions Are Merely Speculative And Subjective.

Because Prof. Kysar did not consider the facts at issue, and because none of the academic research he relies on is either relevant or reliable, Prof. Kysar's opinions are nothing more than his own, untested, subjective beliefs.  That is not a valid basis for an expert opinion.

Rule 702 requires "more than subjective belief or unsupported speculation." *See Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994) (upholding the exclusion of expert testimony because "the experts' conclusions about the cause of these conditions are [not] based on anything more than subjective belief and unsupported speculation.").  Prof. Kysar's half-baked opinion is littered with his subjective beliefs, but a few are illustrative of his failings.

Prof. Kysar's key opinion is that consumers are likely to be misled by New Balance's labeling.  Kysar Decl. at ¶¶ 5, 36, 39 (ECF No. 60-23).  Prof. Ksyar admits, however, he did not conduct any original research related to the actual language at issue (by way of a survey or consumer interviews) and none of the academic articles he relies on address this language either.  Ex. 2, Kysar Tr. 49:25-50:9, 91:24-95:8, 108:17-109:3.  Instead, he relies on his subjective opinion that New Balance's disclaimer is "inherently vague or incomprehensible." *Id.* at 100:12-15.  That Prof. Kysar claims he could not understand the language is irrelevant, and says nothing to the class of consumers at issue in this matter.  Similarly, he opines that even a "motivated expert" could not understand New Balance's disclaimer language.  Kysar Decl. at ¶ 35 (ECF No. 60-23).  At his deposition, he defined "motivated expert" as an "accountant" or "value chain manager," but admits he did not do any study of any of these types of experts to see if they understood the language or not.  Ex. 2, Kysar Tr. 277:11-278:5.

Further to support this opinion, he concludes that consumers are unlikely to read and internalize the entirety of New Balance's "Made in the USA" label.  Kysar Decl. at ¶¶ 5, 33 (ECF No. 60-23).  But again, he acknowledges he conducted no empirical research (Ex. 2, Kysar Tr. 40:25-41:13) and none of the articles that he relies on for this point address New Balance's qualified claim language (*id.* at 91:24-95:8, 108:17-109:3) or any qualified "Made in the USA" labeling at all (*id.* at 93:21-94:2, 260:20-261:2).

In line with this opinion, Prof. Kysar also refers to New Balance's "Made in the USA" labeling as "idiosyncratic." *Id.* at 88:20-89:3.  Prof. Kysar, however, admits that he undertook no research effort to determine what the landscape of "Made in the USA" labeling actually looks like to determine if that is the case. *Id.* at 89:1-90:2.  Rather, his opinion is drawn only from his misplaced reliance on a single article from 20 years ago that consumers believe "Made in the USA" means

45

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

all or almost all Made in the USA (*see* Ex. 17, Maronick 1995 at 25).  And, indeed, he ignores that this same article concludes that "Made in the USA" labeling is unimportant.[21]

As an underpinning of these opinions, Prof. Kysar assumes that individuals are motivated to seek out "Made in the USA" goods, making the labeling material to consumers.  Ex. 2, Kysar Tr. 36:20-37:1.  This not only ignores the Maronick research that says that consumers do not care about country of origin labeling (*see* Ex. 17, Maronick 1995 at 30 ("[T]he addition of a 'made in USA' claim may be wasted"; Ex. 18, Maronick 2005 at 274 ("[County of origin] claims are among the least important factors in their purchase decisions")), but Prof. Kysar also admits he does not have any factual support to know if that is the case for New Balance's "Made in the USA" labeled sneakers.  Ex. 2, Kysar Tr. 86:18-87:4.  Indeed, this is underscored by the fact that Prof. Kysar's reasoning is based on an assumption that New Balance has the "Made in the USA" product line because consumers care about it and New Balance is a profit-maximizing entity.  *Id.* at 44:3-45:21, 105:7-107:20.  Prof. Kysar, however, admits that he has no information whatsoever about why New Balance started or maintains its "Made in the USA" product line and that he does not know the specific profit margins on the "Made in the USA" shoes.  *Id.* at 46:3-10.

Simply put, Prof. Kysar's opinions are not grounded on either the facts of this case or research that addresses those facts.  Prof. Kysar admits these failings:

- **Q:** And none of what you did looked at actual consumers who were involved in the process of buying a Made in the USA New Balance shoe, correct?  **A:** To this stage in the proceedings, no.  *Id.* at 51:19-24.

---

[21] Despite the Maronick Articles being Kysar's key references, he also does not attempt to apply Maronick's holdings that the importance of Made in the USA labeling varies by both product type and customer demographic to the facts at hand. Indeed, Kysar admits that sneakers are not addressed by Maronick, and that he has no information as to New Balance's customer demographics.

46
NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

- **Q:** And, so just to be clear, none of what you looked at address[es] the actual labels or disclaimers at issue here, correct? **A:** That's right. *Id.* at 51:15-18.

- **Q:** Was the question you were asked to answer unique to New Balance Made in the U.S.A. sneakers? **A:** I don't believe so. *Id.* at 43:12-15.[22]

While Prof. Kysar's approach may be acceptable for a research paper, that is not the standard applied to an expert opinion in litigation and particularly not to an opinion being offered to support whether there is an ascertainable class of people in California who have been harmed by New Balance's actual label on real products.

For all of these reasons, the Court should grant New Balance's Motion to Exclude the Declaration of Douglas A. Kysar.

### C.   Mr. Weir's Opinions Should Be Excluded

The opinions and testimony offered by Colin B. Weir should be excluded by this Court for three main reasons: (1) Mr. Weir's deposition testimony suggests that he is not a "qualified" expert under the standards set forth in Rule 702; (2) Mr. Weir's survey concept and structure fails to address the relevant damages as alleged by Plaintiffs; and, (3) Mr. Weir's survey methodology is fundamentally flawed.

### 1.   Mr. Weir Is Not A "Qualified" Expert.

Mr. Weir has been qualified as an expert in other matters and by other courts, and a review of his credentials on paper appears to reflect that he should be a

---

[22] Prof. Kysar acknowledges that his task was merely theoretical. *See* Ex. 2, Kysar Tr. 50:17-51:9 ("Q. Well, you were asked, in part, to opine on whether you think people would be misled by the labeling, correct? A: I was asked to think sort of at an abstract level. Like imagine there's a creature called the reasonable consumer acting under the circumstances of this campaign, would that individual, this is a hypothetical individual, would that individual likely be misled by the various claims and purported disclaimers of this campaign? So the nature of the assignment is not pitched towards generating granular or original survey or experimental evidence, but the nature of this assignment is to talk about that kind of collective hypothetical entity, the reasonable consumer targeted under these circumstances."). Notably, when asked, Prof. Kysar could not define either "reasonable" or "targeted" consumer. *See id.* at 31:15-34:13; 94:11-95:12.

1    qualified expert in economics.  However, Mr. Weir's deposition testimony shows

2    that he is not genuinely qualified to offer opinions to this Court.

3         In his initial Weir Declaration (ECF No. 60-22), Mr. Weir expressed the

4    asserted price premium paid by putative class members through the following

5    simple (though incorrect) mathematical formula: 10.1/100 = 11.23%.  At his

6    deposition, when the mistake in the basic equation was pointed out, Mr. Weir was

7    asked to confirm that, in fact, 10.1/100 equals 10.1%, rather than 11.23%.  In

8    response, Mr. Weir professed an inability to perform simple math, "[a]gain, I'm

9    terrible at mental math, so I'll have to reserve until I get a calculator."  *See* Ex. 19,

10   Colin B. Weir Deposition Transcript ("Weir Tr."), 232:4-6, 231:25-233:12.  When

11   offered a calculator to confirm whether the math was indeed correct, he continued to

12   refuse to perform such calculations.  *Id.* at 233:13-25 ("Q: Here you can.  You can

13   borrow my phone.  A: I don't wish to.  Q: I'm asking you to put the numbers into

14   the calculator.  A: I understand.  I'm here to answer questions.  Q: And you've

15   indicated that you can't do the math – you can't check the math until you get the

16   calculator.  Can you do me a favor and just do the math?  A: No, thank you.").  In

17   fact, the transcript goes on for seven (7) pages during which Weir refused to answer

18   the simple math question posed to him (moving a decimal point two spaces)—

19   whether 10.1 divided by 100 equals 10.1%.  *Id.* at 231:14-238:2.  This is an exercise

20   that any qualified economics expert should be able to complete.  His refusal is all

21   the more astonishing because the equation at issue was included in his report, and

22   was the expression of the ***ultimate conclusion*** of his expert opinion calculating the

23   asserted price premium at issue in this case.

24        There are only two possible explanations for Mr. Weir's refusal to answer the

25   questions at his deposition.  The first possibility is that Mr. Weir, who has a

26   bachelor's degree in Business Economics and an MBA, and seeks to be qualified as

27   an expert in economics by this Court, genuinely does not have the knowledge and

28

expertise in basic math to understand how percentages work.  In that case, he cannot be qualified as an expert because he lacks the basic skills in the relevant field.  The second (and, given his resume, more likely) possibility is that Mr. Weir was trying to avoid answering a simple, basic question based on a fear that he had made an error in his report, and could not figure out the nature of the error.  At a minimum, this testimony is disingenuous and calls into question his credibility as an expert witness. In either event, it casts serious doubt on his credentials.

### 2. Mr. Weir's Survey Concept And Structure Fails To Address The Relevant Damages Issue.

Even if Mr. Weir is ultimately accepted as an expert, his testimony should be excluded because his survey concept and structure simply fails to address or provide a calculation for the damages flowing from Plaintiffs' alleged theory of harm.  Mr. Weir states that, "In this litigation, price premium damages for the Class are … the difference in market value between what was promised, and what was delivered." Weir Decl. at ¶ 21 (ECF No. 60-22).  But while he admits that the relevant goal was to measure the difference in value between (1) what was promised—*i.e.*, what the customer expected to receive, and (2) what was delivered—*i.e.*, what the customer actually received, he failed to identify what customers' expectations actually were and likewise failed to correctly identify what customers' actually received.

Because Weir's survey fails to (1) test for how potential class members actually perceive and understand a "Made in the USA" claim and what their expectations are and (2) identify what those same class members actually received from New Balance, his model cannot determine the value difference between expectation and delivery and is not grounded in any facts.  As such, his report and opinions fail to assess damages as alleged under Plaintiffs' theory of the case and therefore are inappropriate and not helpful to the trier of fact.  *See* Fed. R. Evid. 702 (An expert must be qualified to opine on a topic that will "***help the trier of fact understand the evidence or determine a fact at issue***.") (emphasis added).

(a)   *Mr. Weir failed to identify what consumers'*
*expectations were.*

To the extent that Mr. Weir seeks to quantify the difference between what consumers expected to receive and what they actually received, Mr. Weir logically must first determine what consumers' expectations were. *See* Butler Report at ¶¶ 9, 30. He fails to do that. Instead, Mr. Weir simply states that consumers "expected" to get a shoe that was "Made in the USA." But what does that mean? Does that mean that consumers expect that 100% of the materials and labor are domestic? Does that mean that consumers expect that the majority of the manufacturing is done in the United States? Rule 702 requires "more than subjective belief or unsupported speculation." *See Claar*, 29 F.3d at 502. Mr. Weir admitted at his deposition that he did no research into consumers' perception or understanding of the phrase "Made in the USA" at all:

> **Q:**   But what you're saying is, what was promised was a shoe that was actually made in the U.S.A., correct?
> **A:**   In the way that a reasonable consumer would understand that term, yes.
> **Q:**   And how does a reasonable consumer understand that term?
> **A:**   That is beyond the scope of my assignment to evaluate how a reasonable consumer would interpret that claim.
> …
> **Q:**   So you don't know how consumers interpret the claim Made in the U.S.A., do you?
> **A:**   Again, that's beyond the scope of my assignment in this case to make that determination.

Ex. 19, Weir Tr. 90:24-91:8, 93:12-17.

Moreover, Mr. Weir has no idea what percentage of prospective class members saw and attended to the "Made in the USA" claims on the shoes sold by New Balance in the first place. He did not endeavor to research this specific question because it was somehow "outside the scope" of his assignment. *Id.* at 177:24-178:5. And, he admitted that he simply does not know how many

50

1    individuals may have purchased the shoes without ever noticing or considering the

2    "Made in the USA" label.  *Id.* at 178:6-15

3         Because he did not test these issues, Mr. Weir does not know whether an

4    individual might understand the phrase "Made in the USA" to mean that a good

5    contains 95%, 80%, or 70% domestic content or value.  *Id.* at 192:5-19.  And

6    because of the way his survey was designed, there is simply no way to know what

7    any participant believed "Made in the USA" meant in the context of his survey—

8    whether that was 100%, 90%, 70%, 50%, etc.—and therefore no way to place a

9    value on what their expectations were.  *See* Butler Report at ¶¶ 30-31.

10        Without performing any study or evaluation of individuals' perceptions of

11   this claim and their resulting expectations, it is also entirely unclear how Mr. Weir

12   can measure the difference between what they expected and what they received, and

13   his responses to deposition questions provide no further insight.  *See* Ex. 19, Weir

14   Tr. 92:15-22 ("Q: You've said that what was promised was a shoe that a reasonable

15   consumer would view as being Made in the U.S.A.  Now, how can you place a value

16   on that if you don't know what a reasonable consumer would accept is something

17   that was Made in the U.S.A.?  A. Because the market price as [extant] in the

18   marketplace measures that value."); *see also* Butler Report at ¶¶ 9-10, 30-37.

19   Without understanding what consumers' baseline expectations were he cannot

20   possibly calculate damages to prospective class members.  *In re Facebook, Inc.,*

21   *PPC Adver. Litig.*, 228 F.D.R. 446, 461 (N.D. Cal. 2012) ("[W]ith regard to the

22   UCL claim for restitution, plaintiffs must be able to prove, for each class member,

23   the difference between what the plaintiff's paid and the value of what the plaintiff's

24   received."); *In re Google AdWords Litig.*, No. 5:08-CV-3369-EDJ, 2012 WL 28068,

25   at *15 (N.D. Cal. Jan. 5, 2012) ("Since the purpose of restitution is to return class

26   members to status quo, the amount of restitution due must account for benefits

27   received").

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS                    17cv00159

1    Indeed, his survey appears to be improperly founded on a presumption of how

2  individuals will perceive a "Made in the USA" label based **solely** on discussions

3  with counsel regarding Plaintiffs' "claims."  As such, it should be excluded as

4  improper.  *See U.S. v. Redlightning*, 624 F.3d 1090, 1111-12 (9th Cir. 2010) (expert

5  testimony excluded for being based on statements from counsel not facts).

6                    **(b)**    ***Mr. Weir failed to correctly identify what***
                                ***consumers received.***
7

8    Mr. Weir's damages model purports to assess the "price premium"

9  differential between a shoe labeled "Made in the USA" and the same exact shoe

10  with no country of origin label.  This model assumes, without support, that for New

11  Balance customers to have received a "correctly" labeled shoe, it would need to

12  have **no** country of origin representations.  But it is undisputed that New Balance is

13  allowed to make **qualified** domestic manufacturing claims.

14    New Balance maintains five manufacturing facilities in the United States and

15  employs over 1,300 American workers.  Ex. 1, Miller Tr. 54:9-19, 48:12-13; Miller

16  Decl. at ¶¶ 8, 12.  This fact is not in dispute and Mr. Weir admitted this in his

17  deposition.  Ex. 19, Weir Tr. 70:25-72:19, 187:20-25.  As a result, there are

18  numerous representations that New Balance could make in connection with its sale

19  of shoes that are manufactured in these facilities, for example: (1) the shoes are

20  "Assembled in the USA," (2) the shoes are "70% Made in the USA," (3) the shoes

21  are "Made in the USA with some foreign materials," or (4) the shoes are "Made in

22  the USA of domestic and imported materials."  And indeed it makes such qualified

23  representations with respect to each of its shoes that are marketed as "Made in the

24  USA" by including clear language disclosing that "Where the domestic value is at

25  least 70%, we have labeled the shoe 'Made in the USA.'"  *See*, *e.g.*, Ex. 3 (print ad),

26  Ex. 4 (hangtag), and Ex. 5 (website).

27

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION          17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

1   Mr. Weir's model fails to take these alternative truthful representations into

2   account.  To the extent Mr. Weir suggests that he can rectify this flaw by adjusting

3   the model to compare "Made in the USA" to "70% Made in the USA" or

4   "Assembled in the USA" he fails to take into consideration the fact that the

5   hundreds of shoe styles that are marketed with the qualified "Made in the USA"

6   claim each have a different percentage of value that comes from materials or labor

7   in the United States.  *See* Declaration of Jason H. Kim in Support of Plaintiffs'

8   Motion for Class Certification, Exhibit H, Deposition of Kristina Feinen, 12:24-13:4

9   (ECF No. 60-10) (explaining that the cost of the dye, for example, may vary from

10  style to style, which will affect the domestic value).[23]  Mr. Weir's model, however,

11  is not designed to accommodate a multitude of variants on either side of the

12  equation – instead it is limited to a comparison between two options, with or without

13  "Made in the USA," and as such cannot form a reliable basis for his opinions here.

14  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (finding expert

15  opinion testimony "requires a valid . . . connection to the pertinent inquiry as a

16  precondition to admissibility.") (quoting *Daubert*, 509 U.S. at 592).

17   Thus, by comparing country of origin claims (*i.e.*, "Made in the USA") with

18  no country of origin claim, Mr. Weir's survey simply did not measure the difference

19  between what was expected and what was received, because what was received was

20  a shoe with a ***qualified*** "Made in the USA" claim.

21                           *     *     *

22   Given that Mr. Weir has not determined what consumers were promised and

23  has used the wrong measure of what consumers received, he cannot reliably

24  calculate these two values or the difference between them. Mr. Weir's ultimate

25  conclusion is not supported by sufficient facts, is simply speculative, and will not

26

27  ─────────────────────
[23] These percentages in fact range from 70% to 99%, varying from style to style.
*See* Miller Decl. at ¶ 20.

28

assist the trier of fact.  *See Harrison*, 2008 U.S. Dist. LEXIS 26197, at *57 (proffered expert testimony cannot be excessively speculative nor lack sufficient factual support) (internal citations omitted); *Am. Booksellers Ass'n. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (same) (citation omitted); *Brooke Grp. Ltd.*, 509 U.S. at 242; *Rushing*, 388 F.3d at 1156 (same).

### 3.   Mr. Weir's Survey Methodology Is Fundamentally Flawed.

Even if his survey were designed conceptually to address the relevant issue in this case, Mr. Weir's testimony should still be excluded because his survey methodology is fundamentally flawed in at least four ways: (1) Mr. Weir failed to survey the correct universe of people, (2) Mr. Weir failed to appropriately replicate market conditions, (3) Mr. Weir's survey is biased, and (4) Mr. Weir failed to take into account relevant and necessary supply side factors.  As such, he has failed to apply any reliable methods to the facts of this case, requiring the exclusion of his opinions.  *See Pecover*, 2010 U.S. Dist. LEXIS 140632, at *20.

### (a)   *Mr. Weir did not test the correct universe.*

Perhaps most fatal to his ultimate opinions and conclusions is the fact that Mr. Weir failed to survey the correct universe of people—consumers in California who purchased New Balance "Made in the USA" labeled shoes.  In examining the asserted price premium paid by purchasers of New Balance shoes marketed as "Made in the USA," the correct universe to examine is those actual purchasers—*i.e.*, the putative class members.  While he could have targeted his survey at potential members of the purported class (as Mr. Poret's survey did), he inexplicably chose not to.  This fatal flaw requires the exclusion of his reports and opinions.  *See Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) (finding a survey should be excluded where the surveyor did not examine the proper universe of consumers).

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

17cv00159

First, Mr. Weir's survey gathered responses from 507 participants who had previously purchased at least one pair of New Balance shoes.  Weir Decl. ¶¶ 52, 53 (ECF No. 60-22).  Yet only 26 of the 507 participants—approximately 5%— were from California.  *See* Butler Report at ¶ 11.  Second, Mr. Weir did not limit his survey participants to individuals who purchased New Balance ***"Made in the USA" shoes***, thus there is no way to know how many of those twenty-six participants purchased shoes that had been marketed as "Made in the USA."  Despite being fully aware that this was a purported class action made up of California purchases of New Balance shoes marketed as "Made in the USA," Ex. 19, Weir Tr. 44:4-8, he chose not to limit the universe of survey participants to those who would potentially be members of this class, *id.* at 130:4-17.

Moreover, of the 26 survey respondents from California, 38% rejected all of the shoe choices in 7 or more of the 12 conjoint data sets they were presented with.  *See* Butler Report at ¶ 11.  Thus, approximately 40% of the data from these California respondents is either not useable or is unreliable for evaluating their preferences within the study.  *Id.*  Which means that, at most, ***only 3%*** of the survey results are actually applicable to the facts at issue here.

### (b)  *Mr. Weir failed to replicate market conditions.*

Mr. Weir's data is also unreliable because his survey does not replicate a real world marketplace purchasing scenario.  As Ms. Butler notes in her report, "[i]t is axiomatic that replicating marketplace conditions is an ***essential*** element of good survey design."  *Id.* at ¶ 54.  In fact, "[a]t a minimum, this requires the survey expert to find out how the [product at issue] is typically encountered in the marketplace" and "[t]he failure to discharge this obligation will often result in the exclusion of the survey."  *Id.* (citing Edwards, G. K. (2012). The Daubert Revolution and Lanham Act Surveys, in Diamond, S. S. & Swann, J. (Eds.) *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 319-362, Chicago, IL: American

1   Bar Association. p. 346); *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218,

2   241 (S.D.N.Y. 2010) ("Because the Ford Survey failed to replicate actual

3   marketplace conditions in which consumers encountered the products at issue here

4   and failed to use an adequate control, it is not a reliable indicator of consumer

5   confusion. Accordingly, the Ford Survey is inadmissible.").

6       Rather than provide his survey participants with an image or other depiction

7   of the shoe choices provided in his conjoint data sets, Mr. Weir chose to provide

8   them with bare text descriptions listing only: brand, category type, support, features,

9   stated country of origin, and price.  *See* Weir Decl. at ¶ 45 (ECF No. 60-22).  These

10  descriptions, however, are far removed from real marketplace decisions where an

11  individual walks into a store, sees the shoes, tries on a pair of shoes (or more), and

12  determines whether the shoe is in fact comfortable, whether it feels right on their

13  foot, and how it looks.  *See* Butler Report at ¶¶ 10, 55.  Even the named Plaintiffs

14  testified that they only purchased their New Balance shoes after a thorough in-store

15  examination, which included actually trying on the shoes.  *See* Ex. 9, Jones Tr.

16  33:24-35:1, 38:22-39:24, 40:13-23; Ex. 10, Dashnaw Tr. 47:9-48:9; Ex. 11, Meier

17  Tr. 45:11-16, 46:12-49:21.  And Mr. Weir admitted that his survey did not take this

18  into consideration.  Ex. 19, Weir Tr. 35:3-12 ("Q: But you have no idea what

19  percentage of people actually try on shoes before they purchase, do you? A: As I sit

20  here today, I don't have a recollection one way or the other. Q: Did you do anything

21  to try to find that out? A: That was not foundational to my research, so I did not

22  endeavor to seek that information.").

23      Additionally, as demonstrated by the fact that a third of survey participants

24  completed the survey in under 7 minutes,[24] presenting the choices in this way can

25  hardly represent a real world shoe purchasing scenario.

26

27  ────────────────────
    [24] This also demonstrates a lack of carefulness and consideration of the choices
28  presented.  Butler Report at ¶¶ 61-62.

1        **(c)**    *Mr. Weir's survey is fundamentally biased.*

2        Mr. Weir's survey is fundamentally biased in a number of ways:

3        **_Assumes Consideration of Country of Origin._**

4        Mr. Weir's survey is designed in a manner that assumes that all consumers

would attend to and take into consideration the country of origin of a product.

Butler Report at ¶¶10, 38.  However, in reality, only a small percentage of

consumers are likely to have paid attention to, let alone relied on, the representations

made regarding the country of origin of these shoes. *See* Poret Report at 13, 37; *see*

*also* Ex. 17, Maronick 1995 at 29; Ex. 18, Maronick 2005 at 274; Ex. 2, Kysar Tr.

190:25-191:7, 221:5-15.

11        **_Overweights Country of Origin._**

12        By excluding the most important factors that play into an individual's shoe

choice—*i.e.*, comfort, fit, style—the importance of the "Made in the USA"

representation was likely overweighted.  *See* Butler Report at ¶¶ 10, 50; Poret

Report at 13 (finding factors such as comfort, fit, look or style, price, brand, and

cushioning far outweighed a claim of "Made in the USA").[25]  Indeed, because Mr.

Weir omits these key factors[26] there is no way to tell whether the country of origin

then became a proxy for more desirable features or attributes that were not included

in the model.  *See Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK,

2014 U.S. Dist. LEXIS 157575, at *35 (N.D. Cal. Nov. 6, 2014).

21        And Mr. Weir's model does not take into consideration the fact that

respondents may have come into the survey with preconceived notions regarding a

_____

[25] *See also* Ex. 19, Weir Tr. 150:2-19 ("Q: Would it surprise you to find out that comfort, fit and style are the three most important things that consumers consider in whether or not to purchase an athletic shoe? . . . Does it surprise you that those are the three most important attributes that consumers consider? A: I'm not surprised one way or the other.")

[26] *See* Weir Decl. at ¶ 41 (ECF No. 60-22) (respondents were told to "[a]ssume that all of the sneakers are the correct size and fit, are of the same durability, and are of a color and design that you would find appealing").

New Balance shoe labeled as "Made in the USA," such that just seeing that cue would indicate to them that the shoe was of a better quality, durability, or comfort, for example.  *See* Ex. 19, Weir Tr. 98:15-20 ("Q: Okay. So consumers may by buy Made in the U.S.A. shoes because they view the quality to be higher, correct? A: That's, again, beyond the scope of my research, so I can't offer an opinion about that one way or the other."), 99:25-100:17 ("Q: And you don't know whether New Balance shoes are more comfortable than other shoes? A: Again, that's beyond the scope of my assignment to have made that evaluation. Q: And you don't know whether or not New Balance shoes that are Made in the U.S.A. are made of a quality that they last longer? A: Again, that's beyond the scope of my assignment to have made a determination about that.").

Indeed, named Plaintiffs each testified that they were very satisfied with their purchases, and that the New Balance "Made in the USA" shoes were more comfortable than any other athletic shoes they have worn.  Ex. 9, Jones Tr. 52:7-17, 68:16-19, 81:15-18; Ex. 10, Dashnaw Tr. 52:25-53:18; 51:1-10; Ex. 11, Meier Tr. 55:10-18.  If other customers feel the same way, this could have significantly biased the responses.

### *Social Desirability Bias.*

Despite Mr. Weir's protestations at his deposition,[27] his survey is undoubtedly subject to social desirability bias.  *See* Butler Report at ¶¶ 58, 59, 60.  Having country of origin as one of only five main features and omitting other key features,

---

[27] Ex. 19, Weir Tr. 249:2-250:18 ("Q: Okay. Are you familiar with the concept of social desirability bias in survey work?  A: I don't think so.  Q: So you're not familiar with the concept that there can be a tendency of some respondents to report an answer in a way they deem to be more socially acceptable than their true answer would be to project a favorable image of themselves to avoid receiving negative evaluations? A: Okay, so that helps me understand what you're talking about. . . . One of the reasons that the web is a great medium for this type of exercise is that the people responding to the survey are not face to face with me having to feel like they're being judged. They know that their responses are anonymous in the survey, and that helps mitigate any bias that might otherwise arise in an in-person interview along the lines that you've described. . . . Q: So there's no possibility that bias exerting itself on the response here?  A: I don't perceive that, no.")

1    the "price premium" he purports to calculate is likely impacted by the tendency of

2    respondents to provide socially desirable answers (*i.e.*, choices that reflect a desire

3    to maintain jobs, and strengthen the economy in the United States).  *Id.* at 59.  It is

4    well documented that social desirability bias may occur without the presence of a

5    live interviewer—and in fact a recent study found rates of "false positives" as high

6    as 23 percent in a study on donor behavior, even though the survey was a self-

7    administered internet survey.  *Id.* (citing Kreuter, F., Presser, S. & Tourangeau

8    (2008). Social Desirability Bias in CATI, IVR, and Web Surveys. *Public Opinion*

9    *Quarterly*, 72(5), 847-865).

### (d)   *Mr. Weir fails to properly account for supply side factors.*

10

11         Mr. Weir's survey and market simulation may measure consumer demand,

12   but it does not model supply side pressures and therefore cannot truly establish what

13   "price premium" consumers would have actually paid in the marketplace.  *See*

14   Butler Report at ¶ 67.  As Ms. Butler notes in her report:

15

16         Data from a conjoint survey or a marketplace simulation based on the
          survey alone cannot address how other supply-side factors in a given

17         marketplace could interact to result in the prices firms would charge for
          their products in the actual marketplace.   These additional factors

18         include issues such as operating costs, profit margins, costs of materials
          and availability, competitor responses, etc.

19

20   *Id.* at 65; *see also Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK,

21   2014 U.S. Dist. LEXIS 173789, at *46 (N.D. Cal. Dec. 15, 2014) ("Without

22   knowing whether or not the prices of comparable products are actually affected by

23   the relevant labeling claims, how can the model accurately isolate the value of the

24   labeling claim to Defendant's product?").  Mr. Weir admitted that he did not review

25   New Balance's operating costs, profit margins, costs of materials, etc., in designing

26   and testing his survey and ultimately reaching his "price premium" conclusion.  Ex.

27   19, Weir Tr. 48:7-49:1.  Thus no calculation he has made in his report can truly

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION            17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

1   reflect any "price premium"—if one even exists—with respect to the New Balance's

2   shoes sold with a qualified "Made in the USA" claim.

3          For all these reasons, the Court should grant New Balance's Motion to

4   Exclude the Declaration of Colin B. Weir.

5   **VI.    CONCLUSION**

6          For each of the reasons set forth above, New Balance respectfully requests

7   that the Court (1) deny Plaintiffs' Motion for Class Certification, (2) deny Plaintiffs'

8   Request for Judicial Notice with respect to Exhibits A and B, to the extent Plaintiffs'

9   request judicial notice of any fact beyond the existence of the opinions themselves

10  in the public record, (3) grant New Balance's Motion to Exclude the Expert Report

11  and Opinions of Douglas A. Kysar, and (4) grant New Balance's Motion to Exclude

12  the Expert Reports and Opinions of Colin B. Weir.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS

1   Dated: November 8, 2017                    Respectfully submitted,

2

3                                       By: /s/ R. David Hosp
                                            R. David Hosp (Pro Hac Vice)
4                                             Massachusetts BBO 634091
                                            Sheryl Koval Garko (Pro Hac Vice)
5                                             Massachusetts BBO 657735
6                                           Mark S. Puzella (Pro Hac Vice)
                                              Massachusetts BBO 644850
7                                           Laura B. Najemy (Pro Hac Vice)
                                              Massachusetts BBO 678756
8
                                            FISH & RICHARDSON P.C.
9                                           One Marina Park Drive
10                                          Boston, MA 02210-1878
                                            Tel:  (617) 542-5070
11                                          Fax:  (617) 542-8906
12                                          hosp@fr.com; garko@fr.com;
                                            puzella@fr.com; najemy@fr.com
13

14                                          Garrett K. Sakimae (SBN 288453)
                                            FISH & RICHARDSON P.C.
15                                          12390 El Camino Real
16                                          San Diego, CA  92130
                                            Tel: (858) 678-5070
17                                          Fax: (858) 678-5099
18                                          sakimae@fr.com

19                                          Elizabeth Brenckman (Pro Hac Vice)
20                                            Minnesota State Bar No. 0388871
                                            FISH & RICHARDSON P.C.
21                                          601 Lexington Avenue, 52nd Floor
22                                          New York, NY 10022
                                            Tel: (212) 765-5070
23                                          Fax: (212) 258-2291
24                                          brenckman@fr.com

25

26

27

28
NEW BALANCE ATHLETICS, INC.'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTION        17cv00159
FOR CLASS CERTIFICATION, OPPOSITION TO PLAINTIFFS' REQUEST FOR JUDICIAL
NOTICE, AND *DAUBERT* MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' REPORTS