1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9         SOUTHERN DISTRICT OF CALIFORNIA
10

11    SHEILA DASHNAW *et al.*,          Case No.:  17cv159-L(JLB)

12                        Plaintiffs,
                                        **ORDER GRANTING (1) MOTION**
13    v.                                **FOR FINAL CLASS ACTION**
                                        **SETTLEMENT APPROVAL; AND**
14    NEW BALANCE ATHLETICS, INC.,      **(2) MOTION FOR ATTORNEYS'**
                                        **FEES, COSTS, LITIGATION**
15                        Defendant.    **EXPENSES, AND PLAINTIFFS'**
                                        **INCENTIVE AWARDS**
16

17

18         This consumer action alleging false advertising has been certified as a class action,

19   and its settlement approved, on a preliminary basis.  Plaintiffs move for final class action

20   settlement approval (doc. no.  117-1 ("Final Appr. Mot.")) and for attorneys' fees, costs,

21   litigation expenses, and Plaintiffs' incentive awards (doc. no. 109-1 ("Atty Fee Mot.")).

22   Defendant does not oppose the motions.  Judith D. Isaacson submitted an objection

23   letter.  (Doc. no. 116 ("Objection").)  Having read and considered the motions and the

24   Objection, including supporting declarations and exhibits, the motions for final approval

25   of class action settlement, and for attorneys' fees, costs, litigation expenses and Plaintiffs'

26   incentive awards are granted.

27         Plaintiffs allege consumer fraud relating to "made in USA" representations on

28   certain New Balance athletic shoes in violation of California False Advertising Law, Cal.

Bus. & Prof. Code §§ 17500 *et seq.* (including violation of § 17533.7 relating to the sale of goods produced abroad); Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*; California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; breach of express warranty; negligent misrepresentation; and unjust enrichment. In the operative complaint (doc. no. 16), Plaintiffs sought injunctive and declaratory relief, restitution or disgorgement of profits or unjust enrichment, and damages, including punitive damages on their own behalf and on behalf of the putative class. The action was filed in State court and removed to this Court. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d).

After an investigation, formal discovery, and motion briefing, the parties settled in private mediation. Plaintiffs filed a motion for preliminary class action certification and settlement approval. The Court ultimately granted the motion and ordered notice be disseminated to the putative class. (Doc. nos. 108, 111, 113.) Pending before the Court are Plaintiffs' motions for final approval of the Amended Settlement Agreement signed December 7, 2018 (doc. no. 106-3 ("Settlement")), for attorneys' fees, costs and litigation expenses totaling $650,000, and enhancement awards of $5,000 to each Plaintiff.

## I.     <u>Class Membership and Representation</u>

In the Preliminary Approval Order (doc. no. 108), the Court certified this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) for purposes of settlement. For the reasons stated therein, and in the absence of new evidence or objections to class certification, the Court certifies for settlement purposes a class comprised of:

> All persons who purchased any and all "Made in USA" Shoes[1] from New Balance and/or its Authorized Retailers in California from December 27, 2012 up to and including January 24, 2019 ("Class" and "Class Period" respectively). "'Made in USA' Shoes" means the New

---

[1]     Unless defined herein, the capitalized terms are defined in the Settlement.

Balance's "Made in USA" labeled shoes listed below and purchased as new by Class members in California during the Class Period:

| ELIGIBLE NEW BALANCE SHOE MODELS | |
|---|---|
| 601 | ML996 |
| M1140 | ML997 |
| M1290 | MR1105 |
| M1300 | MR993 |
| M1400 | MW812 |
| M1540 | PM15 |
| M1700 | PM16 |
| M2040 | US574 |
| M3040 | US576 |
| M498 | US990 |
| M574 | US993 |
| M585 | US998 |
| M587 | W1140 |
| M770 | W1290 |
| M990 | W1400 |
| M991 | W1540 |
| M995 | W3040 |
| M996 | W498 |
| M997 | W587 |
| M9975 | W990 |
| M998 | W998 |
| MK706 | WK706 |
| ML1300 | WR993 |
| ML1978 | WW812 |

Excluded from the Class are: (a) New Balance's board members and employees, including its attorneys; (b) any persons who purchased the "Made in USA" Shoes for the purposes of resale; (c) distributors or resellers of "Made in USA" Shoes; (d) the judge and magistrate judge and their immediate families presiding over this action; (e) governmental entities; and (f) persons or entities who or which exclude themselves from the Class as provided in the notice.

(*See* Prelim. Approval Order at 2-4.)[2]  The Settlement Administrator received requests for exclusion from 171 individuals.  (Finegan Final Appr. Decl. (doc. no.

_____

[2]    All page number references are assigned by the ECF system.

117-5) at 13; *id.* Ex. H (doc. no. 117-13).)  These 171 individuals are excluded from the Class.

## II.    Notice to the Class

In the Preliminary Approval Order, Heffler Claims Group was appointed as Settlement Administrator for purposes of notice to the Class and claim processing. (Prelim. Approval Order at 6; *see also* Settlement ¶¶ II.10, 17, 23.)  The Court approved, with changes, the proposed notice of class action certification and settlement, and set a schedule for notice, claim submissions, exclusions, and objections.  (Prelim. Approval Order at 6-8.)

### A.    Notice Content

A class certification notice "must clearly and concisely state in plain, easily understood language" the following:

> (i)      the nature of the action;
> (ii)     the definition of the class certified;
> (iii)    the class claims, issues, or defenses;
> (iv)    that a class member may enter an appearance through an attorney if the member so desires;
> (v)     that the court will exclude from the class any member who requests exclusion;
> (vi)    the time and manner for requesting exclusion; and
> (vii)   the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. Proc. 23(c)(2)(B).  In addition, Rule 23(e) requires notice of class action settlement which "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward to be heard."  *In re Online DVD-Rental Antitr. Litig.,* 779 F.3d 934, 946 (9th Cir. 2015) (internal quotation marks and citation omitted).

The Court approved, with changes, the content of the long-form and summary notice proposed by the parties, including the release, claim form and exclusion form. (Prelim. Approval Order at 6 & Exs. A, B.)  Subsequently, to accommodate the

parties' requests for extensions of time and changes to the notice procedure, the Court approved additional content changes. (*See* Feb. 20. 2019 Order (doc. no. 111); Feb. 22, 2019 Order (doc. no. 113).) Nevertheless, the parties further altered the language of these documents without Court approval. (*Cf., e.g.,* Prelim. Approval Order at 19, 22 *with* Finegan Final Appr. Decl. Ex. B (doc. no. 117-7) at 7, 9.)

Although the Court does not condone alterations of Court-approved notice, the content of the notice distributed to the Class is approved because the notices as distributed were adequate to meet Rule 23(c)(2)(B) and (e) requirements.

**B.    Notice Distribution**

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Such notice can be given by "United States mail, electronic means, or other appropriate means." *Id.* Consistently, notice of class action settlement must be distributed "in a reasonable manner to all class members who would be bound by the propos[ed settlement]." *Id.* 23(e)(1)(B). "When individual notice by mail is not possible, courts may use alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1129 (9th Cir. 2017) (internal quotation marks and citation omitted). In this regard, "publication in a periodical, on a website, or even at an appropriate physical location" may be sufficient. *Id.* (citations omitted).

The Court ordered notice dissemination through a number of channels (Prelim. Approval Order at 6-7), as proposed by the Settlement Administrator (Finegan Prelim. Decl. (doc. no. 106-14) at 10-11, 13-15)) and incorporated into the Settlement (Settlement ¶I V.A.1.).

### 1.    Direct Notice

Direct notice was distributed by email and United States first class mail. (Finegan Final Appr. Decl. at 9.) Settlement Administrator timely sent 51,282 emails

containing the long form notice. (*Id.*; *cf.* Settlement ¶ IV.B.1.b.; Feb. 20. 2019 Order at 4.) Of those notices, 2,038 bounced and 239 putative Class members unsubscribed. (Finegan Final Appr. Decl. at 9.) Settlement Administrator timely sent 3,093 summary notices by first class mail to putative Class members who unsubscribed, whose email notices were returned as undeliverable, or for whom only a physical address was available.[3] (*Id.; cf.* Settlement ¶ IV.B.1.c.; Feb. 20, 2019 Order at 4.) Of the notices sent by U.S. mail, 247 were returned as undeliverable. (Finegan Final Appr. Decl. at 9.) Upon return of undeliverable notices, the Settlement Administrator was to perform an address search and re-send them to new addresses no later than March 14, 2019 (Settlement ¶ IV.B.1.d.; Feb. 20, 2019 Order at 4); however, notices were not re-sent until *May 14, 2019.* (Finegan Final Appr. Decl. at 9.) Accordingly, 157 notices were sent two months late and only three weeks before the claims due date. (*See* Feb. 20. 2019 Order at 4.) No justification for the failure to follow the Court's orders has been provided.

### 2.   Notice by Publication

Because nearly 95% of putative Class members were unknown,[4] the Settlement Administrator proposed a comprehensive program for notice by publication, which the Court adopted. (Finegan Prelim. Decl. at 10-11, 13-15; Prelim. Approval Order at 6.)

---

[3]      It is possible that 3,903 notices were sent. Ms. Finegan references 3,093 notices; however, she also states that this amount included 1,626 records without any email address, 2,038 bounced emails and 239 unsubscribed email addresses, which adds to 3,903. (Finegan Final Appr. Decl. at 9.)

[4]      According to Defendant, 984,835 purchases of "Made in USA." Shoes were made in California during the Class Period. (Kim Final Appr. Decl. (doc. no. 117-2) at 4.) Of those, Defendant provided addresses for 52,908 putative Class members (Finegan Final Appr. Decl. at 8), which represents approximately 5% of the putative Class membership.

### a.    Publication in Print

The summary notice was published in print.  (Finegan Final Appr. Decl. at 10-11.)  Based on Settlement Administrator's recommendation that The Los Angeles Times was "the most efficient print title," which "far outstrips any other print title in reader inclination or index," the Court adopted the recommendation to publish the summary notice in a "1/8th page ad unit" in The Los Angeles Times on four consecutive Sundays with a "Spanish sub headline directing Spanish speakers to the website for more information."  (Finegan Prelim. Appr. Decl. at 14; Prelim. Approval Order at 6.)  Publication notice was to commence on Sunday, February 10, 2019.  (*See* Prelim. Approval Order at 6*;* Settlement ¶ IV.B.3.)

After the due date, in late afternoon on Friday, February 15, 2019, Plaintiffs filed a motion to modify the notice plan because the summary notice could not fit a 1/8th page ad unit.  (Doc. no. 110.)  According to the Settlement Administrator, as revised by the Court, the notice contained 1,100 words and was "more than double the word count that would fit into that ad unit."  (Finegan Modif. Decl. (doc. no. 110-1) at 2.)  As noted in the February 20, 2019 Order, the summary notice as originally proposed by the parties (doc. no. 106-5) had 973 words, and was therefore already approximately double the word count that would fit the ad.  (Feb. 20, 2019 Order at 3.)  The initial proposal to publish the summary notice in The Los Angeles Times as a 1/8th page ad unit was therefore grossly inadequate from the beginning, but the parties did not disclose this to the Court until after the publication due date.  The Class Counsel and the Settlement Administrator had failed to perform their duties with due diligence.  (Feb. 20, 2019 Order at 3.)

As an alternative to increasing the size of a print ad in The Los Angeles Times, the Settlement Administrator recommended publishing in People magazine's California edition, which would result in a lesser increase in the cost of notice.  (Finegan Modif. Decl. at 2.)  In addition, it would "maintain[] the integrity and efficiency of the outreach effort while ***increasing*** the target audience reach" by 2%

(*Id.* (emphasis in orig.).)  In reliance on the Settlement Administrator's representations and to avoid prejudice to the putative Class members, the Court adopted the recommendation and ordered publication no later than February 22, 2019.  (Feb. 20, 2019 Order at 4-6.)

As reflected in the subsequent motion for emergency relief, the parties and Settlement Administrator had neglected to inform the Court of two additional material facts.  First, the earliest possible print publication date in People magazine was *March 22, 2019*; and second, the People magazine California edition is published only every two or three weeks, *i.e.,* notice would be published once in People magazine rather than four times in The Los Angeles Times Sunday edition.  (Emerg. Mot. (doc. no. 112 ) at 3; Finegan Final Appr. Decl. at 10 (notice published once).)  The summary notice published in People magazine also did not include a "Spanish sub headline directing Spanish speakers to the website for more information," as promised by the Settlement Administrator.  (*Cf.* Finegan Prelim. Appr. Decl. at 14 & Prelim. Approval Order at 6 *with* Finegan Final Appr. Decl. Ex. D (doc. no. 117-9) at 3.)  Accordingly, the Settlement Administrator and Class Counsel failed to perform their duties under the orders of this Court.

### b.     *Online Banner Ads*

Online banner ads informed viewers of the pending settlement and directed them to the settlement website.  (Finegan Final Decl. at 11; *id.* Ex. E (doc. no. 117-10).)  According to the Settlement Administrator, based on marketing and media use research, 89% of the putative Class members were frequent internet users, including social media.  (Finegan Prelim. Appr. Decl. at 13.)  The Settlement Administrator recommended online ads targeting individuals within the Class member profile in English and Spanish on websites and social media.  (*Id.* at 13-14.)  The Court adopted the Settlement Administrator's recommendations and ordered internet
/ / / / /

publication to begin no later than February 7, 2019[5] and continue through April 8, 2019.  (Prelim. Approval Order at 6; Settlement ¶ IV.B.3.)  The parties assured the Court that they would comply.  (Emerg. Mot. at 2.)  Nevertheless, the Settlement Administrator's final report indicates that the notice program "was substantially completed" on *March 23, 2019*,[6] or more than two weeks early.  (*See* Finegan Final Appr. Decl. at 2.)  In this regard, the Settlement Administrator and Class Counsel again deviated from the orders of this Court.

*c.*     *Press Release*

A press release consisting of the summary notice was timely issued over PR Newswire's California and California Hispanic Newslines.  (Finegan Final Appr. Decl. at 11; *id.* Ex. F (doc. no. 117-11); *cf.* Finegan Prelim. Appr. Decl. at 11, 14-15; Prelim. Approval Order at 6.)  Full text of the release was picked up by 293 online outlets and social media sites, including Associated Press outlets.  (*Id.* Ex. G (doc. no. 117-12) at 5, 40.)

*d.*     *Settlement Website and Toll-Free Phone Line*

The Court adopted the Settlement Administrator's recommendations to establish (1) a settlement website as a landing page for online banner advertising where putative Class members could access the full-length notice, together with the release, claim form and exclusion form, electronically submit claims and requests for exclusion, and view important case filings; and (2) a 24-hour toll-free informational phone line.  (Finegan Prelim. Appr. Decl. at 11, 15; Prelim. Approval Order at 6-7.)  As of June 21, 2019, 103,140 users visited the settlement website and 156 calls were made to the toll-free line.  (Finegan Final Appr. Decl. at 12-13.)

---

[5]     At the request of the parties, the Court extended the February 7, 2019 commencement deadline to February 22, 2019.  (Feb. 20, 2019 Order at 4.)

[6]     The Settlement Administrator does not provide a more specific end date.  (*Id.*)

9

According to the Settlement Administrator, the notice, by direct mail and publication combined, reached 74% of the putative Class members with an average frequency of 5.5 times. (Finegan Final Appr. Decl. at 2.) Without condoning the deficiencies in performing the Settlement Administrator's obligations under the Settlement and Court orders, the actual timing and manner of distributing notice were adequate to meet the constitutional and statutory requirements.

**III.**     **Settlement Fairness**

Class action settlements require court approval. Fed. R. Civ. Proc. 23(e). "[S]ettlement of class actions present[s] unique due process concerns for absent class members [in part because] class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee." *In re Bluetooth Headset Prod. Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted); *see also Evans v. Jeff D.*, 475 U.S. 717, 733 (1986) (noting the possibility of tradeoff between merits relief and attorneys' fees often implicit in class action settlement negotiations.) The Court's role in reviewing class action settlements "is to police the inherent tensions among class representation, defendant's interests in minimizing the cost of the total settlement package, and class counsel's interest in fees." *Staton v. Boeing Co.*, 327 F.3d 938, 972 n.22 (9th Cir. 2003); *see also Bluetooth*, 654 F.3d at 946. If, as here, the proposed settlement

> would bind class members, the Court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A)     the class representatives and class counsel have adequately represented the class;
>
> (B)     the proposal was negotiated at arm's length;
>
> (C)     the relief provided for the class is adequate, taking into account:
>         (i)     the costs, risks, and delay of trial and appeal;

*/ / / / /*

10

<table>
<tr><td>(ii)</td><td>the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;</td></tr>
<tr><td>(iii)</td><td>the terms of any proposed award of attorney's fees, including timing of payment; and</td></tr>
<tr><td>(iv)</td><td>any agreement required to be identified under Rule 23(e)(3); and</td></tr>
</table>

(D)     the proposal treats class members equitably relative to each other.

Fed. R. Civ. Proc. 23(e)(2).[7]

The Court received one Objection.  The Objection, however, was not to the Settlement fairness or class action certification.  The objector disagrees with the law and the reality that manufacturers of quality products may be subject to lawsuits for various reasons.  Because the Objection does not speak to any fairness factors, it does not warrant rejecting the Settlement.

---

[7]     Subsection (e)(2) was added to Rule 23 as a part of the 2018 amendments. Fed. R. Civ. Proc. 23, *Advisory Comm. Notes.*  Prior to the amendment, the analysis was guided by the *Churchill* factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*Bluetooth,* 654 F.3d at 946 (quoting *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); other citation omitted).  The goal of the 2018 amendment "was not to displace any factor, but rather to focus . . . on the core concerns . . . that should guide the decision whether to approve the propos[ed settlement]." Fed. R. Civ. Proc. 23, *Advisory Comm. Notes.*  Several of the *Churchill* factors were incorporated into Rule 23(e)(2) as amended.  The remaining factors are discussed as relevant.

## A.    Adequacy of Representation and Arm's Length Negotiations

As relevant to class action settlements, Rule 23(e)(2)(A) and (B) require consideration whether the class representatives and class counsel adequately represented the class, and whether the proposed settlement was negotiated at arm's length.  Also relevant to the inquiry are the terms of any proposed attorneys' fees, including timing of payment.  Fed. R. Civ. Proc. 23(e)(2)(C)(iii).

### 1.    Adequacy of Class Counsel's Representation

Based on the submissions filed in support of preliminary settlement approval and settlement class certification, the Court provisionally appointed Jason H. Kim and Aubry Wand as Class Counsel.  (Prelim. Approval Order at 4.)  Before reaching Settlement, Class Counsel engaged in informal investigation and thorough discovery, including depositions and expert discovery.  They fully briefed their motion in support of class certification and opposed Defendant's *Daubert* challenges to Plaintiffs' experts and motion for judgment on the pleadings.  The Settlement was initially reached with a private mediator's assistance, and the negotiations were finished among counsel.  (*See* Kim Atty Fee Decl. (doc. no. 109-2); *id.* Ex. A (doc. no. 109-3); Wand Atty Fee Decl. & Ex. A (doc. no. 109-6)).

The proposed Settlement provides for injunctive and monetary relief.  The injunctive relief requires that for five years, Defendant's shoes with less than 95% domestic content less prominently advertise the "Made in USA" label and disclose that the "Made in USA" collection contains domestic value of 70% or greater.[8] (Settlement ¶ III.D.)  In the monetary relief portion of the Settlement, Defendant agreed to create a non-reversionary Escrow Fund of $750,000 from which $200,000 is to be paid to the Settlement Administrator for Administrative Costs, $15,000 for

---

[8]    It appears that the injunctive relief stops short of enforcing California Business and Professions Code §17533.7.

Plaintiffs incentive awards, subject to Court approval, with the balance to be used for Class member claims and, if any funds remain, for *cy pres* awards. (*Id.* ¶ III.A.) Defendant also agreed to pay without objection up to $650,000 to Class Counsel for attorneys' fees, costs and litigation expenses, subject to Court approval. (*Id.* ¶ VIII.) Accordingly, the Settlement obligates Defendant to pay up to $1.4 million in exchange for dismissal of this action and release of claims, including Class members' claims.

Based on the submissions made in support of the Attorneys' Fee Motion and Final Approval Motion, as well as on the docket in this case, the Class Counsel had sufficient information to negotiate a fair Settlement and had adequately prosecuted this action with Plaintiffs' assistance.

2.    Attorneys' Fees

Where, as here,

> a settlement agreement is negotiated prior to formal class certification, . . . [¶] . . . such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair.

*Bluetooth,* 654 F.3d at 946. The Court has a duty to look for any "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. Examples of such subtle signs are

> (1) when counsel receive a disproportionate distribution of the settlement . . .;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds . . .; and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (citations and most internal quotation marks omitted).

13

The Settlement includes all three features.

> [T]hat the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award. Even when technically funded separately, the class recovery and the agreement on attorneys' fees should be viewed as a "package deal." . . . [A]ssessment of the settlement's overall reasonableness must take into account the defendant's overall willingness to pay.

*Id.* at 948-49 (internal citation and some quotation marks and brackets omitted). First, Defendant is willing to pay a total of $1.4 million, while attorneys' fees comprise the better part of $650,000.

Second, the Settlement includes a "clear sailing" arrangement (Settlement ¶ VIII.A.) whereby "the defendant agrees not to oppose a petition for a fee award up to a specified maximum value." *Bluetooth,* 654 F.3d at 940 n.6. This "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Id.* at 947.

Finally, the Settlement includes an implied "kicker," whereby "all fees not awarded would revert to defendants rather than be added to the *cy pres* fund or otherwise benefit the class." *Bluetooth,* 654 F.3d at 947. The kicker is implicit in that Defendant agreed to pay without objection up to $650,000 for attorneys' fees, costs and litigation expenses subject to Court approval. (Settlement ¶ VIII.A.) The Settlement does not allow that, if the Court awards less, the difference be added to the non-reversionary Escrow Fund for the benefit of the Class. (*See id; cf. id.* ¶ III.A.1 ($750,000 Escrow Fund is "non-reversionary" in that no part of it reverts to Defendant).)

Although the $650,000 sum was negotiated with the mediator's assistance (Atty Fee Mot. at 14), this, by itself, is not sufficient to assure that the attorneys' fee amount was the product of collusion-free negotiations in light of the clear sailing and

14

kicker provisions. *Bluetooth*, 654 F.3d at 948. The Court "ha[s] a special obligation to assure itself that the fees awarded in the agreement [are] not unreasonably high." *Id.* at 948 (internal quotation marks, brackets and citation omitted); *see also id.* at 941. Specifically,

> [W]hen confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding "unreasonably high" fees simply because they are uncontested.

*Id.* at 948 (citation omitted).

> For this same reason, a kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger of collusion already suggested by a clear sailing provision. If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is no apparent reason the class should not benefit from the excess allotted for fees. The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees.

*Id.* at 949 (internal citation and some quotation marks and brackets omitted).

The Court therefore turns to the Attorneys' Fee Motion. "[A]ttorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement." *Bluetooth*, 654 F.3d at 941(citing Fed. R. Civ. Proc. 23(h)). Defendant agreed to pay up to $650,000 for attorneys' fees, costs and litigation expenses. (Settlement ¶ VIII.) This amount was negotiated with the mediator's assistance after the parties had agreed on relief to be provided to the Class. (Kim Final Appr. Decl. at 2.)

Class Counsel request $227,620.22 for costs and litigation expenses. (Kim Atty Fee Decl. at 5 & Ex. C (doc. no. 109-5); Wand Atty Fee Decl. at 8.) They contend they incurred fees in the aggregate sum of $750,145.50, billed at their regular hourly rates. (Kim Atty Fee Decl. at 3 ($316,968); Wand Atty Fee Decl. at 4

& Ex. A ($433,177.50).)  However, they request no more than $650,000 for fees, costs and litigation expenses combined.

### a.    Costs and Litigation Expenses

Class Counsel submitted declarations summarizing costs and litigation expenses amounting to $227,620.22.  (Kim Decl. at 5 & Ex. C ($117,854.26); Wand Decl. at 8 ($109,765.96).)  Because the lists included insufficient support for the requested sums, the Court issued the Order for Supplemental Documentation.  (Doc. no. 119.)  Based in the issues raised in the order, Class Counsel provided additional information regarding travel expenses, expert fees, Westlaw legal research charges, and line items which were not sufficiently identified in the motion.  (Resp. to Order (doc. no. 120).)  Class Counsel reduced their request by $21,264.62 to eliminate duplication of travel expenses and account for a retainer refund due from one of their experts.  (*Id.*)  Further, they explained that $2,448.71 in Westlaw charges represents a pro rata portion of the monthly Westlaw fees attributable to the pending case (*id.* at 7), which the Court finds to be reasonable.  Accordingly, Class Counsel's request for 206,355.60 in costs and litigation expenses is reasonable under Rule 23(h).

### b.    Attorneys' Fees

After costs and litigation expenses, $443,644.60 remains available for attorneys' fees from the agreed-upon sum of $650,000.  "The award of attorneys' fees in a class action settlement is often justified by the common fund or statutory fee-shifting exceptions to the American Rule, and sometimes by both."  *Bluetooth*, 654 F.3d at 941.  Attorneys' fees in the pending case are based on the Settlement, which provides for payment from a common fund.  (*See* Atty Fee Mot. at 2.)  Alternatively, the Consumer Legal Remedies Act, Cal. Civ. Code §1780(e), and the private attorney general statute, Cal. Code of Civ. Proc. §1021.5, provide for attorneys' fees. Regardless of the Settlement provision, in a class action the Court has an independent
/ / / / /

duty to consider the reasonableness of the requested attorneys' fees. *Bluetooth*, 654 F.3d at 941.

Two different methods for calculating reasonable attorneys' fees have been approved depending on the circumstances -- the lodestar method and percentage-of-recovery method. *Bluetooth*, 654 F.3d at 941-42.

> The "lodestar method" is appropriate in class actions brought under fee-shifting statutes . . ., where the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized, but where the legislature has authorized the award of fees to ensure compensation for counsel undertaking socially beneficial litigation. [¶] Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or the percentage-of-recovery method. Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar.

*Id.* at 941-42 (citations omitted).

The Settlement provides for monetary and injunctive relief. The Court therefore turns to the lodestar method to determine whether the attorneys' fee request is reasonable.

> The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer.

*Bluetooth*, 654 F.3d at 941.

Kim, a partner at Schneider Wallace Cottrell Konecky Wotkyns LLP, has approximately twenty years of litigation experience, including complex civil litigation and class actions. (*See* Kim Prelim. Appr. Decl. App. A (doc. no. 106-8) at 3; Kim Atty Fee Decl. (doc. no. 109-2) at 2.) He is based in northern California and customarily bills his work at $775 per hour. He has adjusted his rate to $550 per hour to more accurately reflect the billing rates for consumer class action attorneys in

this District. (Kim Atty Fee Decl. at 2-4 & Ex. B (doc. no. 109-4).) Plaintiffs also request fees for electronic discovery specialist Abigail Laudick, an attorney licensed in Maryland and Massachusetts, at the rate of $175 per hour, and paralegal Sam Marks at the rate of $125 per hour. Wand of The Wand Law Firm, P.C., had approximately five years of class action litigation experience at the outset of this case. (Wand Atty Fee Decl. (doc. no. 109-6) at 2-3.) He is based in Los Angeles and customarily bills his work at $525 per hour. He has adjusted his rate to $475 to more accurately reflect the prevailing rates in this District. (*Id*. at 4.) The Court finds that the requested hourly rates are reasonable.

Kim submitted detailed billing records showing that he, Laudick, and Marks collectively billed 413.5 hours to this case. (Kim Atty Fee Decl. Exs. A, B.) From the actually billed hours, he had excluded all time for attorneys who billed less than 5 hours each to this case. (Kim Atty Fee Decl. at 3.)

Although Wand also submitted time records, they are not detailed in that all time entries for a day are entered together, thus making it difficult to determine how much time was spent on each task. (*See* Wand Atty Fee Decl. Ex. A.) Block billing like this "makes it more difficult to determine how much time was spent on particular activities." *Welch v. Metropolitan Life Ins. Co.,* 480 F.3d 942, 948 (9th Cir. 2007). It may therefore support a finding that the attorney failed to carry his burden and warrant a reduction to arrive at the reasonable number of hours. Wand's time records state that he billed 825.1 hours to this case. (Wand Atty Fee Decl. Ex. A.)

Upon review of the billing records, the Court reduced time for entries lacking sufficient description,[9] reflecting excessive time spent for the task, or excessive duplication of time between counsel. The Court based its assessment on the

---

[9]    Entries which do not specify a subject matter (for example, designated generally as "email string" with client or opposing counsel) and reflecting more than a minimal amount of time, and unspecified "legal research," were reduced.

counsel's stated experience and expertise in the area of consumer class actions.[10] Because Class Counsel were awarded litigation expenses for case-related onboard internet charges during travel,[11] it is assumed that corresponding time was billed to the relevant tasks and cases. Time described solely as travel was reduced. Accordingly, the Court finds that Kim, Laudick and Marks together reasonably billed 359 hours, and Wand reasonably billed 653 hours to this case.

Based on the foregoing, the lodestar amounts to **$488,053**. The lodestar is presumptively reasonable. *Bluetooth,* 654 F.3d at 941-42 & n.7. It can be adjusted by an appropriate positive or negative multiplier using the *Kerr* factors if necessary to achieve reasonableness:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[12]

*Id.* at 942 n.7 (quoting *Kerr v. Screen Extras Guild, Inc.*, 526 F.3d 67, 70 (9th Cir. 1975)). Because "[m]any of these factors are subsumed within the calculation of hours reasonably expended at a reasonable rate[, . . .] the *Kerr* factors only warrant a

---

[10]    The Court reduced time billed for resubmitting deficient filings when the defects should have been readily apparent to an attorney with Class Counsel's experience and expertise. (*See, e.g.,* docs. no. 58, 101, 105.)

[11]    *See* Kim Atty Fee Decl. Ex. C; *see also* Resp. to Order at 4 n.3.

[12]    "At least one factor is no longer valid – whether the fee was fixed or contingent." *Bluetooth,* 654 F.3d at 92 n.7 (citation omitted).

19

departure from the lodestar in rare and exceptional cases." *Id.* (internal quotation marks and citations omitted). "Foremost among these considerations, however, is the benefit obtained for the class." *Id.* at 942. "Thus, where the plaintiff has achieved 'only limited success,' counting all hours expended on the litigation—even those reasonably spent—may produce an 'excessive amount,' and the Supreme Court has instructed district courts to instead 'award only that amount of fees that is reasonable in relation to the results obtained.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983)).

This is not a rare case warranting departure from the lodestar. The attorneys' skills, risks of contingency litigation, preclusion of other work due to accepting this case, and the experience, reputation and ability of counsel are already reflected in the billing rates approved by the Court. The calculation of reasonable hours, while based on the counsel's experience and expertise in consumer class action litigation, also allows for additional work necessitated by issues which do not occur as a matter of course, such as, for example, Defendant's constitutional challenge to California Business and Professions Code §17533.7.

The recovery obtained for the benefit of the Class is modest. Defendant provided information showing that 984,835 pairs of shoes were sold in California with the allegedly misleading "Made in USA" labeling. (Kim Final Appr. Decl. at 4.) According to Plaintiffs' expert, each pair sold at a $10.10 premium. (Prelim. Appr. Mot. at 24.) The maximum possible award was therefore approximately $10 million. To settle, Defendant agreed to somewhat ameliorate the allegedly misleading nature of its advertising for five years and pay no more than $1.4 million.[13] (Settlement ¶¶

---

[13] Plaintiffs acknowledge that the value of injunctive relief is difficult to quantify with precision. (Atty Fee Mot. at 20-21.) Defendant submitted a declaration outlining the efforts it will undertake to comply, which Plaintiffs value at $6.1 million. (Michael Decl. (doc. no. 106-3) at 104-07; Prelim. Appr. Mot. (doc. no. 106-1) at 25.) This valuation has limited probative value because it is not entirely

III., VIII.)  The $488,053 lodestar represents approximately 35% of the monetary relief obtained for the benefit of the Class.[14]  When considered in light of the opposition to class certification, *Daubert* challenges to Plaintiffs' price premium calculation, and the constitutional challenge to Plaintiffs' claims, the expense of prosecuting the case through trial, and the uncertainty of the outcome on one hand, and on the other hand, the monetary recovery and benefit of injunctive relief, the lodestar strikes a fair balance between the benefit conferred on the Class and the amount of attorney work necessary to achieve it.  Accordingly, neither an increase nor a reduction of the lodestar is warranted.

The $488,053 lodestar exceeds $443,644.60, which remains available from the agreed-upon sum of $650,000 after payment of costs and litigation expenses.  Under the Settlement, Class Counsel cannot recover more than $443,644.60.  (Settlement ¶ VIII.A.)  The Court therefore finds that the request for attorneys' fees is reasonable under Rule 23(e) and (h).  Neither the amount of attorneys' fees, the clear sailing arrangement, nor the kicker provision render the Settlement unfair to the Class.

### 3.   Plaintiffs' Representation of the Class and Incentive Awards

Based on the submissions filed in support of preliminary approval, the Court provisionally appointed Plaintiffs Sheila Dashnaw, William Meier, and Sheryl Jones

---

supported by evidence.  More importantly, the injunctive relief appears to fall short of fully enforcing the law.  (*Cf.* Settlement ¶ III.D. *with* Cal. Bus. & Prof. Code §17533.7.)  Rather than estimate the monetary value of the injunctive relief to the Class, the Court relies on the lodestar method to evaluate the reasonableness of requested attorneys' fees.  *See Staton,* 327 F.3d at 974.

[14]   "If an agreement is reached in the amount of a settlement fund and a separate amount for attorney fees the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class."  *Bluetooth,* 654 F.3d at 943 (internal quotation marks, ellipsis and citation omitted); *see also id.* at 945.  For purposes of this case, the Court combines the $750,000 Escrow Fund and the additional $650,000 amount for attorneys' fees, costs and litigation expenses.

as representatives for the certified Class (collectively "Plaintiffs"). (Prelim. Approval Order at 4.)  As relevant to adequacy of representation, the Court considers whether (1) "the named plaintiffs . . . have any conflicts of interest with other class members and (2) will [they] prosecute the action vigorously on behalf of the class." *Online DVD-Rental*, 779 F.3d at 943(internal quotation marks and citation omitted).

Under the Settlement, each Plaintiff may receive up to $5,000 as an incentive award for service as a Class representative.  (Settlement ¶¶ III.A.2., VIII.C.)  Plaintiffs each request $5,000.  Incentive awards such as this "are discretionary and are intended to compensate class representatives for work done on behalf of the class, [and] to make up for financial or reputational risk undertaken in bringing the action . . .." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  The amount of the award must be related to the actual service or value the class representative provides to the class. *See id*. at 960.

Although incentive awards are "fairly typical in class actions," *Rodriguez*, 563 F.3d at 958, they "should not become routine practice," lest the representatives be "tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Radcliffe v. Experian Information Solutions Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (internal quotation marks and citations omitted).  The potential conflict between the representative and the class is exacerbated when, as here, there is a large difference between the requested incentive award and individual class member recovery. *See id*. at 1165.  Accordingly, "courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Id*. at 1164.

Plaintiffs' request for $5,000 each vastly exceeds the monetary relief available to each Class member under the Settlement.  Nevertheless, the amount is not so high as to bring into question Plaintiffs' adequacy of representation. *See Online DVD-Rental*, 779 F.3d at 947 (approving $5,000 incentive awards where class members

/ / / / /

received $12 each).  The combined request for $15,000 represents approximately 1% of the $1.4 million monetary relief under the Settlement.  *See id.*

Plaintiffs benefitted the Class by filing and prosecuting this action, responding to formal written discovery, being deposed, and providing input to Class Counsel, including regarding Settlement.  Meier devoted 29.5 hours, Dashnaw devoted 32.5 hours, and Jones devoted 41 hours to the prosecution of this action.  (Docs. no. 109-7 through 9.)

No structural differences are present in the Settlement.  Plaintiffs and the Class members have the same kind and amount of claims against Defendant, and no sub-classes are warranted in this case.  *See Online DVD-Rental*, 779 F.3d at 943.  Accordingly, Plaintiffs had no incentive to favor one group of Class members over another.

Finally, there appears to have been no agreement for payment of incentive awards between Plaintiffs and Class Counsel before the Settlement.  The incentive awards are conditioned on Court discretion, as the Settlement does not guarantee each Plaintiff $5,000.  (Settlement ¶ VIII.C.)  Under the circumstances, the requested awards are reasonable.

### 4.  Arm's Length Negotiations

The Settlement was reached with the assistance of a private mediator after thorough investigation, discovery and substantive motion briefing.  The amounts requested for attorneys' fees and Class representative incentive awards are reasonable.  Viewed as a whole, the Settlement terms are fair under the circumstances.  Based on the evidence presented, the Settlement appears to have been reached through arm's length negotiations.

### B.  Adequacy of Relief Provided to the Class

Rule 23(e)(2)(C) requires the Court to consider whether the relief provided for the Class is adequate in light of

(i)  the costs, risks, and delay of trial and appeal;

23

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3)[.]

In addition, Rule 23(e)(2)(D) requires consideration whether "the proposal treats class members equitably relative to each other."

### 1. Costs, Risks, and Delay of Trial and Appeal

As discussed in the context of attorneys' fees, the Settlement provides a modest relief to the Class. Each Class member can recover a maximum of $10 per qualifying pair of shoes, up to $50 for 5 or more pairs, or $100 per household. (Settlement ¶ III.B.8.) If funds remain after all valid claims are paid, or any claim payment checks remain uncashed, the remainder is to be distributed in equal parts to the Public Justice Foundation and Consumer Federation of California as *cy pres* recipients. (*Id.* ¶ III.C.2.) On the other hand, if valid Class member claims exceed the fund, the claim payments are reduced pro rata. (¶ III.C.1.) The Settlement includes injunctive relief, which somewhat ameliorates the allegedly misleading "Made in USA" advertising for five years, and a payment of not more than $1.4 million, of which $750,000 is available for payment of Administrative Costs, Plaintiffs' incentive awards, Class members' claims, and *cy pres* awards, if any. (Settlement ¶¶ III.A., VIII.)

The case was aggressively litigated through settlement. No reason exists to expect that the same intensity of litigation would not continue if the case had not settled. Defendants vigorously opposed class certification, mounted *Daubert* challenges to Plaintiffs' price premium calculation, and questioned the constitutionality of Plaintiffs' statutory claims. If Plaintiffs survived these challenges, bringing the case to trial would entail significant time and expense, while the outcome was uncertain. Based on the expense of prosecuting the case through

1  trial, and the uncertainty of the outcome, the relief provided to the Class is adequate

2  for purposes of settlement.

3                    2.    Equitable Treatment of Class Members

4          The Settlement distinguishes among Class members depending on the number

5  of pairs of qualifying shoes they purchased.  Each Class member can recover a

6  maximum of $10 per pair, up to $50 for 5 or more pairs, or $100 per household.

7  (Settlement ¶ III.B.8.)  Approximately 3% of the valid claims were submitted for

8  more than one pair of shoes.  (*See* Finegan Final Appr. Decl. at 15.)  It is unclear

9  whether any of those claims were for more than five pairs per person or more than

10  ten pairs per household.  (*See id.*)  Given the small percentage of possibly affected

11  Class members, the proposed plan of distribution is equitable.

12                    3.    Claim Distribution

13          Each Class member who wished to receive any monetary compensation had to

14  submit a Claim Form no later than June 6, 2019.  (Settlement ¶ III.B.; Finegan Final

15  Appr. Decl. Ex. B (doc. no. 117-7 ("Notice")) at 2, 5, 7; *see also* Notice App. B

16  (Claim Form).[15])  The Claim Form, signed under penalty of perjury, required Class

17  members to provide contact information, including a physical address, and list the

18  shoe model they purchased from the list of eligible shoe models, including the date

19  and location of purchase.  No other proof of purchase was initially required to submit

20  a claim for one pair of shoes for a maximum payment of $10.  Class members who

21  submitted a claim for more than one pair had to provide proof in the form of a

22  receipt, photo of the shoes, purchase order, or credit card statement reflecting the

23  purchase.  Regardless of the number of shoes claimed, the Settlement Administrator

24  _____

25  [15]     The Claim Administrator failed to provide copies of any of the three

26  attachments to the long-form notice distributed to the Class (App. A (Release and
    Waiver of Claims), App. B (Claim Form) and App. C (Exclusion Form).  (*See*

27  Finegan Final Appr. Decl. Exs. A-I (docs. 117-6 through 14).)  The Court accessed

28  these documents on the settlement website.

could request additional proof to validate the claim, which had to be provided within 35 days of request, or the claim could be reduced or denied. Class members with questions were directed to the settlement website and the toll-free number. Ultimately, valid claims are to be paid by check via U.S. mail sent no later than 14 business days after final judgment in this case. (Settlement ¶ III.B.7-9, C.3 & II.A.20.; Notice at 8.) The *cy pres* awards are to be disbursed to the beneficiaries no later than 180 calendar days after final judgment. (Settlement ¶ III.C.2. & 4.)

The Class members submitted a total of 58,120 claims; however, the Settlement Administrator rejected 9,548 as invalid and approved 48,572. (Finegan Final Appr. Decl. at 15.) Upon the Court's request (doc. no. 122), the Settlement Administrator provided a detailed breakdown of reasons for rejecting these claims. (Mahan Decl. (doc. no.123).) The Court finds the Settlement Administrator's processing of these claims to be reasonable. No claims were rejected for untimeliness or inability to provide proof of purchase. (*See* Mahan Decl.)

The valid claims reflect an approximately 5% participation rate. (Finegan Final Appr. Decl. at 15.) Although the rate is very low, *see Briseno,* 844 F.3d at 1131 (noting "[i]t is not unusual for only 10 or 15% of the class members to bother filing claims" (citation omitted)), this is not necessarily fatal to the Settlement, *see Online DVD-Rental*, 779 F.3d at 945 ("settlements have been approved where less than five percent of class members file claims" (citation omitted)).

Requests for exclusion were received from 171 putative Class members (Finegan Final Appr. Decl. at 13) and one Class member objected. As noted, the Objection was not directed to the terms of the Settlement or Class certification. Accordingly, the Class members' response to the Settlement does not preclude a finding of fairness.

/ / / / /

The total amount of valid claims is $490,420.[16]  After deductions for the administrative costs of up to $220,000[17] (Kim Final Appr. Decl. at 13) and Plaintiffs' incentive awards totaling $15,000, the Escrow Fund balance is sufficient to provide a 100% payment to the Class members who filed valid claims.  The remaining funds (at least $24,580) and any funds remaining due to returned or uncashed Settlement checks shall be distributed as *cy pres* awards.  (Settlement ¶ III.B.2.)  The Court approves the claim payment and *cy pres* distribution plan as stated in the Settlement and the Settlement Administrator's July 25, 2019 declaration.

### 4.    Attorneys' Fees

As discussed above, the requested attorneys' fees are reasonable.  The fees are to be paid within 14 business days after final judgment in this case. (Settlement ¶¶ VIII.A., II.A.20.)  Because this action does not involve a coupon settlement, the timing of payment does not preclude a finding of reasonableness or settlement fairness.  *See Online DVD-Rental*, 779 F.3d at 949-50.

### 5.    Agreements Required to Be Identified

According to Plaintiffs' there are no agreements other than the Settlement. (Kim Final Appr. Decl. at 4.)

### C.    Government Participation

Because Defendant filed a motion for judgment on the pleadings arguing that California Business and Professions Code §17533.7 violates the First Amendment, notice of the challenge was served on the California Attorney General pursuant to 28

---

[16]    This amount may be increased, if the Settlement Administrator is able to obtain any of the physical addresses which the Class members had not provided. (*See* Mahan Decl. at 4.)

[17]    *See* Settlement ¶ III.A.; February 20, 2019 Order at 5.  The Settlement Administrator's invoices so far have not reached this amount.  *See* Finegan Final Appr. Decl. Ex. I.

U.S.C. § 2403(b) to provide him an opportunity to intervene.  (Doc. no. 87.)  The Attorney General filed a notice of non-intervention.  (Doc. no. 94.)

Furthermore, Defendant provided notice of class action settlement to the United States Attorney General and California Attorney General pursuant to 28 U.S.C. §1715.  (Najemy Decl. (doc. no. 117-4).)  No government officials have objected to the Settlement.  (Kim Final Appr. Decl. at 5.)

### D.    Settlement Fairness

For the reasons stated above, the Court finds the Settlement fair, reasonable, and adequate under Rule 23(e).

## IV.    Order

The motions for final class action settlement approval (doc. no. 117) and for attorneys' fees, costs, litigation expenses and Plaintiffs' incentive awards (doc. no. 109) are granted.  The parties and the Settlement Administrator shall timely perform their remaining obligations under the Settlement, orders of this Court and as stated above, including payment of Class members' claims, attorneys' fees, costs and litigation expenses, Plaintiffs' incentive awards, Administrative Costs and *cy pres* awards, as well as compliance withe the injunctive relief conferred by the Settlement.

**IT IS SO ORDERED.**

Dated:  July 29, 2019

Hon. M. James Lorenz
United States District Judge